UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KARL TRAHAN, Individually and on Behalf of All Others Similarly Situated, | : : : | No. 1:16-cv-03161-SEB-TAB |
| Plaintiff, | : : | CLASS ACTION |
| vs. | : : : | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| INTERACTIVE INTELLIGENCE GROUP, INC., GENESYS TELECOMMUNICATIONS LABORATORIES, INC., GIANT MERGER SUB INC., GREENEDEN LUX 3 S.ÀR.L., GREENEDEN U.S. HOLDINGS I, LLC, GREENEDEN U.S. HOLDINGS II, LLC, DONALD E. BROWN, MITCHELL E. DANIELS, EDWARD L. HAMBURG, MICHAEL C. HEIM, MARK E. HILL and RICHARD A. RECK,, | : : : : : : : : : | DEMAND FOR JURY TRIAL |
| Defendants. | : : | |
| | : | |

1239887_1

Lead Plaintiff Karl Trahan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges: (i) violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 17 U.S.C. §78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9; (ii) and violations of Section 20(a) of the Exchange Act, 17 U.S.C. §78t(a). Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission (the "SEC") filings, as well as other publicly available information.

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought on behalf of the holders of Interactive Intelligence Group, Inc. ("Interactive" or the "Company") common stock against Interactive, its Board of Directors (the "Board"), Genesys Telecommunications Laboratories, Inc., a California corporation ("Parent"), Giant Merger Sub Inc., an Indiana corporation and a direct, wholly owned subsidiary of Parent ("Merger Sub"), Greeneden Lux 3 S.àR.L., a societe a responsabilite limitee under the laws of Luxembourg ("Lux 3"), Greeneden U.S. Holdings I, LLC, a Delaware limited liability company ("Holdings I"), and Greeneden U.S. Holdings II, LLC, a Delaware limited liability company ("Holdings II," and with Parent, Merger Sub, Lux3, and Holdings I, "Genesys").

2.      On August 31, 2016, Interactive and Genesys announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement"), under which Genesys would acquire all of the outstanding shares of Interactive common stock in an all-cash transaction worth $60.50 per share in cash, or a total of approximately $1.4 billion (the "Acquisition"). The Acquisition was completed on December 1, 2016.

3.      The Acquisition was conditioned on, among other things, approval by a majority of shares of Interactive's common stock. Defendant Donald E. Brown ("Brown"), Interactive's longtime Chairman of the Board, Chief Executive Officer, and President, owned 17.1% of the Company's stock and agreed to vote his shares in favor of the Acquisition. Moreover, the rest of the

- 1 -

Board and Interactive's remaining officers, who collectively owned another 2.4% of the Company's outstanding stock, were also expected to vote in favor of the Acquisition. Accordingly, only 37.9% of Interactive's independent stockholders needed to vote "YES" in order for the Acquisition to be approved.

4.      Interactive's insiders, including notably defendant Brown, had a strong financial interest in ensuring that the Acquisition went through, as they stood to earn a substantial payout from unvested and vested (but illiquid) equity holdings, and the Company's management stood to receive additional special consideration flowing from lucrative post-close arrangements with Genesys.

5.      To induce the Company's minority stockholders into supporting the Acquisition, Interactive filed a materially misleading Schedule 14A Proxy Statement (the "Proxy Statement") with the SEC on October 4, 2016, thus violating the federal securities laws governing stockholder communications.

6.      *First*, the Proxy Statement was materially misleading because its presentation of Interactive's purported financial projections deceived stockholders as to the Company's true prospects. Specifically, the Proxy Statement touted financial projections that forecast the last few months of 2016 as well as 2017 and 2018. The Proxy Statement also touted financial analyses performed by Union Square Advisors LLC ("Union Square"), Interactive's financial advisor, that used the 2016-2018 financial projections to perform a discounted cash flow ("DCF") analysis. By disclosing projections only through 2018 – regardless of whether any longer-range projections existed – Defendants concealed the fact that Interactive expects explosive growth to occur well beyond 2018 due to the functional superiority, scalability, and profitability of its recently launched PureCloud Platform ("PureCloud"). The truncated disclosure implies that Interactive's business is expected to level off after 2018, which is objectively and subjectively false.

7.      *Second*, the Proxy Statement was also materially misleading because it included only an enterprise-level summary of Interactive's financial projections and failed to provide any information about the Company's specific lines of business. The Company's business includes (i) an on-premises, all-in-one omnichannel customer engagement software suite, (ii) a single-tenant, all-in-

- 2 -

one omnichannel customer engagement cloud service, and (iii) PureCloud, but the businesses feature markedly different financial attributes and radically different growth profiles. Specifically, PureCloud is a high-margin business that was launched only recently, and it promises tremendous growth well into the future. By contrast, Interactive's other businesses involve lower margins and are expected to dwindle both as new customers gravitate toward PureCloud and as existing customers migrate over to PureCloud.

8. ***Third***, the Proxy Statement is also misleading because it deceptively touts Union Square's financial analyses, namely, its DCF analysis, as supporting the Board's assertion that the Acquisition was fair. Union Square utilized the perpetuity growth rate, as opposed to the terminal multiple method, in performing its DCF analysis, and this objectively wrong. Both the Board and Union Square were fully aware of the Company's growth potential beyond 2018, yet they relied on an approach that assumes that the projections period (2016-2018) reflects normalized growth. The Proxy Statement is also misleading because the DCF used financial projections that the Board and Union Square knew did not accurately reflect the Company's growth potential.

9. By peddling financial projections and financial analyses that did not accurately depict Interactive's potential (and which the Individual Defendants knew did not accurately depict the Company's potential), Defendants misled Interactive stockholders into voting for the Acquisition in violation of the federal securities laws. Indeed, Defendants deceived Plaintiff and the Class as to Interactive's true value and precluded the Company's stockholders from casting an informed vote on the Acquisition. Interactive's stockholders were damaged as a result of Defendants' misconduct because the materially misleading Proxy Statement caused stockholders to support a transaction that provided inadequate value for their shares of Interactive common stock.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the 1934 Act for violations of Sections 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

1239887_1

11.     This Court has personal jurisdiction over all Defendants because they are all either a corporation that conducts business in and maintains operations in this District, or an individual who has sufficient minimum contacts with the State of Indiana so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Interactive's headquarters are located at 7601 Interactive Way, Indianapolis, Indiana, and Defendants include persons who are believed to reside in this District.

## PARTIES

13.     Plaintiff was at all relevant times a stockholder of Interactive.

14.     Defendant Interactive is an Indiana corporation headquartered in Indianapolis, Indiana.  Interactive was a signatory to the Merger Agreement.

15.     Defendant Parent is a California corporation headquartered in San Francisco, California.  Genesys was a signatory to the Merger Agreement.

16.     Defendant Merger Sub is an Indiana corporation and a direct, wholly owned subsidiary of Parent.

17.     Defendant Lux 3 is a societe a responsabilite limitee under the laws of Luxembourg. Lux 3 was a signatory to the Merger Agreement.

18.     Defendant Holdings I is a Delaware limited liability company.  Holdings I was a signatory to the Merger Agreement.

19.     Defendant Holdings II is a Delaware limited liability company.  Holdings II was a signatory to the Merger Agreement.

20.     Defendant Brown was the co-founder of Interactive and at all relevant times served as Interactive's Chairman, President, CEO, and a member of the Board.

21.     Defendant Mitchell E. Daniels ("Daniels") served as a member of the Board from 2015 through the completion of the Acquisition.

22.     Defendant Edward L. Hamburg ("Hamburg") served as a member of the Board from 2004 through the completion of the Acquisition.

- 4 -

23.     Defendant Michael C. Heim ("Heim") served as a member of the Board from 2007 through the completion of the Acquisition.

24.     Defendant Mark E. Hill ("Hill") served as a member of the Board from 2004 through the completion of the Acquisition.

25.     Defendant Richard A. Reck ("Reck") served as a member of the Board from 2005 through the completion of the Acquisition.

26.     Defendants Brown, Daniels, Hamburg, Heim, Hill, and Reck are collectively referred to as the Board or the Individual Defendants.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all public holders of Interactive common stock who are being and will be harmed by defendants' actions described below (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

28.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

29.     The Class is so numerous that joinder of all members is impracticable.  According to Interactive's SEC filings, as of the close of business on September 30, 2016, the record date for stockholders voting on the Acquisition, there were 22,326,212 shares of Interactive common stock issued and outstanding.

30.     There are questions of law and fact which are common to the Class, including:

(a)     Whether the Proxy Statement misrepresented or omitted material information;

(b)     Whether, as a result of the materially false or misleading or inadequate Proxy Statement, Defendants have acted in violation of Section 14(a) of the Exchange Act, 17 U.S.C. §78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9;

(c)     Whether the Individual Defendants are liable as control persons under Section 20(a) of the Exchange Act, 17 U.S.C. §78t(a);

- 5 -

(d)     Whether Genesys is liable as a control person under Section 20(a) of the Exchange Act, 17 U.S.C. §78t(a);

(e)     Whether any of Defendants aided and abetted any of the foregoing violations of the Exchange Act; and

(f)     Whether the Class has suffered damage and is entitled to any relief as a result of Defendants' violations of the federal securities laws.

31.     Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff is not subject to any atypical defenses.

32.     Plaintiff is an adequate representative of the Class, has no interests adverse to the Class, is committed to fairly and adequately protecting the interests of the Class, and has retained competent counsel experienced in litigation of this nature.

33.     This action is maintainable under Rule 23(b)(1) and (3) of the Federal Rules of Civil Procedure.  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.  Moreover, questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

*Interactive's Business*

34.     Interactive is an Indianapolis-based company that was founded in 1994 and provides unified business communications solutions for call centers, enterprise IP telephony, and business process automation.  Backed by a 20-plus year history of industry firsts, 150-plus pending patent applications, and more than 6,000 global customer deployments, Interactive offers customers fast return on investment, along with robust reliability, scalability, and security.  It is also the only

1239887_1

company recognized by the top global industry analyst firm as a leader in both the cloud-based and on-premises customer engagement markets.

35.     For much of its existence, Interactive provided "on-premises" solutions to help call centers manage their communications.  Under this regime, telecommunications software was setup and administered on the premises of the call center, which gave the customer control over its software but also required more time and expense to start up.  Interactive established itself as a key player in this field through its Customer Interaction Center® ("CIC") business.

36.     As business and technology began to take advantage of the Internet, Interactive launched various cloud-based offerings, including through its Communications as a Service$^{SM}$ ("CaaS") business.  Customers seeking to resolve a problem or learn about products and services have increasingly turned to websites, online messaging, chats, and other relatively new methods of communicating with a business.

37.     As the Company explained in its 2013 Annual Report, filed with the SEC on a Form 10-K on March 12, 2014: "Given the growing availability and use of cloud services, some call centers are finding it more cost-effective to make the transition to multichannel contact center functionality via the cloud, since on-premises equipment and integrations costs are minimized or eliminated with cloud solutions."  According to Interactive, advantages of its cloud-based systems over more traditional on-premises systems included increased flexibility (including scalability), faster deployment, minimal upfront capital expense, and reduced IT staff requirements.

38.     On June 3, 2014, Interactive announced that it was developing PureCloud, a next generation cloud communication platform that would include various services to address unified communications and contact center markets.  As the press release announcing PureCloud explained:

> The PureCloud suite of application services is based on new distributed cloud architecture built atop Amazon Web Services. ***It's designed to provide rapid deployment, maximum reliability, and unlimited scalability, while connecting customers and employees in new, more efficient ways***.
>
> "Many of the current cloud-based communications offerings are far from enterprise-grade," said Dr. Donald E. Brown, Interactive Intelligence founder and CEO. "Most of them leave their customers dead in the water if Internet connectivity is lost or the service itself is interrupted. PureCloud, however, was designed to handle the scalability, reliability and security needs of the largest global organizations.

- 7 -

"With PureCloud, organizations also have the option to deploy Edge devices within their networks that enable them to continue to operate even if the Internet is unavailable, and also to keep voice traffic on their networks rather than passing it over the public Internet."

*      *      *

"We're now unique in that we can offer customers a mature, premises-based solution, as well as both single-tenant and multitenant cloud services," Brown said. "***Our aim is to provide everything organizations need for communications, collaboration, and customer engagement, in whatever way they want it delivered***."

39.    On January 7, 2015, Interactive announced that it had released the first in many services to be delivered from the Company's PureCloud system.  The inaugural service, PureCloud Directory$^{SM}$, was designed to increase productivity and enhance collaboration by enabling employees to quickly find, connect, and communicate with the right person with the right set of skills at the right time.

40.    As of the January 2015 initial rollout, PureCloud was available only in North America and only in English, French, and Spanish.

41.    Interactive thereafter worked to rollout PureCloud in other languages and in other geographies, including Australia and New Zealand (as of April 2015), Europe (September 2015), and Japan (March 2016).  The Company has also had a limited launch of PureCloud in Latin America.  As of when the Acquisition was announced, Interactive had not yet launched PureCloud in the vast majority of Latin American, the Middle East, Africa, and anywhere in Asia beyond Japan, but the Company had plans to continue expanding PureCloud's footprint.

42.    In addition to expanding its geographic and linguistic reach, Interactive has also continued rolling out various services related to PureCloud throughout the remainder of the year. Interactive launched PureCloud Collaborate$^{SM}$ and Communicate$^{SM}$ services on or about March 16, 2016, and PureCloud Engage$^{SM}$ on or about June 9, 2015.  Moreover, given the versatility of the PureCloud platform, Interactive has stated that it can and will continue to develop and release new functions for the PureCloud platform on an ongoing basis.  Defendant Brown stated during a February 1, 2016 conference call, "***And on the product side, it's full steam ahead***."  In a conference

- 8 -

call held later that year, Brown touted numerous other new capabilities that had been, or was expected to be, delivered to PureCloud customers.

43.  The Company's PureCloud business is already a major success story, and it promises tremendous long-term growth.  So much has Interactive backed PureCloud to succeed that, as of January 1, 2016, PureCloud would be the focal point of Interactive's business.

44.  Interactive made clear that it was not winding up its legacy businesses (including on-premises and older cloud offerings).  Brown stated on an August 3, 2015 conference call that, although the focus would be on PureCloud: "all the while we'll continue to enhance our CIC battleship for organizations preferring a premises-based private cloud alternative."

45.  Nonetheless, despite Interactive's continued commitment to the legacy businesses, they do not offer a potential for growth comparable to PureCloud.  Indeed, PureCloud boasts huge growth potential as well as favorable business attributes (high margins and easy scalability and, thus, high profitability).

46.  During a conference call August 3, 2015, Brown touted the Company's ambitions with respect to PureCloud:

> We're really excited about these client services and think they represent a game changing approach that will shake the industry.  We've designed them to be very fast to deploy and easy to configure with little or no customization. We've also designed them to be very profitable to operate which should allow us to enjoy gross margins once they ramp up.
>
> *            *            *
>
> **Make no mistake about our ambitions for PureCloud** – we're aiming to handle everything from small organizations wanting to sign up online with the credit card to global companies looking for the most advanced set of customer engagement and communications solutions on the market . . . .

47.  Brown has amplified those sentiments in subsequent conference calls.  As he stated on February 1, 2016:

> It's important for our investors to understand that **we're attacking the entire range of the customer engagement market with PureCloud**.  We believe we can effectively meet the needs of organizations that have five contact center agents or 50,000. . . . **PureCloud more than doubles our addressable market compared to our previous product offerings**.

48.  Brown added during the same call:

Overall, we feel that we've *greatly enhanced our already enviable competitive position with PureCloud*. We built our own technology for speech recognition, quality monitoring, workforce management, Web co-browsing, video collaboration, social media monitoring, and telco services. We can – *we believe we can package all of these functionality at price points that our competitors can't touch, deploy it in timeframes that they can't match, and yet do so at 70 to 80 point margins that will make us nicely profitable in the years ahead*. . . . We believe we have a unique offering in PureCloud, which will allow us to crush the competition, while continuing to amass high growth recurring revenue. . . . Again, PureCloud is a game-change for our industry, and we're excited for 2016 and beyond. *We are ready to drive this opportunity home and dominate our industry*.

49.     Brown also addressed PureCloud during another earnings conference call held on

May 2, 2016:

We are in the *early stages of disrupting the customer engagement marketplace* with PureCloud by, one, making the traditional procurement and contracting process an afterthought, two, providing low cost, quick installation packages to get cusomters up and running, and, three, continuing to add new PureCloud features at a rapid clip. . . . *The positive feedback we've received from prospects and customers smaller and large is proving that PureCloud is a game changer for our industry and we are excited for 2016 and beyond*.

50.     Beyond its own well-founded ambitions, Interactive has received extensive validation

from the market about the superiority of its PureCloud platform.

51.     On March 10, 2016, Interactive received awarded Cloud Computing magazine's 2015

Product of the Year Award.  The press release announcing the award stated in pertinent part:

### Interactive Intelligence Has Won Cloud Computing Magazine's 2015 Product of the Year Award

*Interactive Intelligence PureCloud Engage[SM] honored for its reliability, scalability, security and simplicity*

. . . Interactive Intelligence Group Inc., a global leader of cloud services for customer engagement, communications and collaboration, has won Cloud Computing magazine's *2015 Product of the Year* Award for PureCloud Engage[SM].

Cloud Computing magazine's Product of the Year Award honors vendors with the *most innovative, useful, and beneficial cloud products and services*.

PureCloud Engage[SM] is an omnichannel customer engagement cloud service that helps contact centers accelerate business impact, deliver consistent outcomes, and innovate the customer and agent experience.  It's delivered from the Interactive Intelligence PureCloud[SM] platform – *the first cloud platform based on microservice architecture designed for multi-use cases*: customer engagement, communications and collaboration.

"We selected PureCloud Engage[SM] as a Product of the Year based on its innovative microservice architecture running atop Amazon Web Services," said TMC CEO Rich

- 10 -

Tehrani.  "Its ***comprehensive set of services running on a single platform also helps customers break down the silo between business users and contact center agents***, and even between enterprises and their partners and customers."

"We built PureCloud Engage[SM] to get customers up and running in days or weeks instead of months," said Interactive Intelligence CMO Jeff Platon.  "To help customers stay competitive, we also made sure that it could deliver value faster through a continuous development process that offers new functionality weekly.  We also got rid of long-term contracts.  Customers can go month-to-month with absolutely no strings attached. ***This makes PureCloud Engage[SM] an extremely low-risk proposition with the potential for dramatic business impact***."

PureCloud Engage[SM] includes rich contact center functionality, such as omnichannel routing, advanced speech-enabled interactive voice response (IVR), call recording, quality management, outbound and predictive dialing, reporting, CRM integrations, and graphical scripting.  Its communications and collaboration functionality includes IP PBX capabilities, chat, video conferencing, corporate directory, desktop sharing, and content management.

52.     On April 13, 2016, Interactive announced the receipt of its second award in as many

months-Frost & Sullivan's 2016 North American Cloud Contact Center Visionary Innovation

Leadership Award.  The press release announcing the award stated in pertinent part:

### Interactive Intelligence Receives Frost & Sullivan's North American Cloud Contact Center Visionary Innovation Leadership Award

*Interactive Intelligence receives award for visionary innovation and performance of its latest cloud solution, PureCloud[SM]*

. . . Interactive Intelligence Group Inc., a global leader of cloud services for customer engagement, communications and collaboration, has received Frost & Sullivan's 2016 North American Cloud Contact Center Visionary Innovation Leadership Award.

Frost & Sullivan selected Interactive Intelligence for the award based on ***the visionary innovation and performance of its latest cloud solution, PureCloud[SM]***.

PureCloud's[SM] unique microservice architecture running on Amazon Web Services enables companies to deploy in days, while offering continuous delivery of the most innovative customer engagement features.  In addition to rich customer engagement features, PureCloud[SM] offers business communications and collaboration functionality.

According to the report, "***Interactive Intelligence has produced a winner*** with the strategy behind the design of PureCloud.  Its ***rapid scalability, flexibility, ease of use, and affordability*** address key needs in the market.  With its ***strong overall performance and potential to increase its market presence*** with PureCloud, Interactive Intelligence has earned Frost & Sullivan's 2016 Visionary Innovation Leadership Award for Cloud Contact Centers."

The Frost & Sullivan North American Cloud Contact Center Visionary Innovation Leadership Award is given to a single vendor based on how it performs against key

competitors in the following areas: company culture, vision alignment, technological sophistication, a focus on unmet needs, growth performance, and growth pipeline.

Commenting on Interactive's technological sophistication, the report states: "PureCloud brings *significant technological advantages to the market*. PureCloud was architected as a set of stateless, independently load-balanced microservices running atop the scalable Amazon Web Services Cloud. This architecture was designed to achieve new levels of reliability, security and scalability. PureCloud also integrates easily with third-party applications using REST APIs."

The report also commends Interactive Intelligence for making it *easy to purchase* PureCloud[SM]. "The company took a number of steps to make it easy and affordable to adopt PureCloud. It created a subscription plan that enables customers to pay monthly for what they use, with no commitment and no hidden fees at competitive prices. It also implemented an online ordering process that enables organizations to purchase directly from the company's website, and lets customers change their subscription at any time."

53.     Moreover, the Company has recently announced positive financial results. On August 1, 2016, Interactive reported total revenues of $108.8 million in the second quarter of fiscal year 2016 (ended June 30, 2016), representing a 13% year-over-year increase when compared to the $96.3 million reported in the same period of the previous year. Additionally, Interactive reported a 43% increase in cloud subscriptions, from $21.9 million in the second quarter of 2015 to $31.3 million.

54.     Commenting on these results, defendant Brown stated:

"*PureCloud is happening* . . . . One number - 204 - the number of newly licensed PureCloud® customers in the quarter, tells much of this story. We had 24 PureCloud customers at the end of last year. *Six months later we had well over 300*. This rapid growth reflects the considerable interest and demand we're seeing from both small and large businesses across all our major geographic markets. This growth also happened with the strong support and involvement of our partners, who accounted for 37% of this quarter's PureCloud deals."

. . . "Our solid top-line results in the quarter were driven by the combination of 43% growth in cloud subscriptions and strong on-premises sales. In addition to a very large transaction that contributed significantly to our on-premises performance, we added another 37 new CIC customers in the second quarter for a total of six deals over $1.0 million. Our top-line growth resulted in *a better than expected bottom line*, and we continued to generate positive operating cash flow in both the second quarter and first half of this year."

. . . "Looking forward, we believe *we remain very well positioned to gain market share* and become the leader in the customer engagement market. As the only vendor in Gartner's "leaders" quadrant for both cloud and on-premises contact center solutions, we're uniquely capable of providing this robust technology that organizations of any size, in any industry, anywhere in the world, can implement in any way. Our commitment to innovation will continue in all phases of our business,

- 12 -

from our new flexible licensing and pricing models and accelerated approach to solutions implementation, to, of course, ***our industry-leading product development***."

55.     Then on September 8, 2016, the Company announced that it had received its third award in 2016, Frost & Sullivan's North American Cloud Customer Contact Center Applications Growth Excellence Leadership Award.  The press release announcing the award stated in pertinent part:

### Interactive Intelligence Receives Frost & Sullivan's North American Cloud Customer Contact Center Applications Growth Excellence Leadership Award

*Interactive Intelligence receives award for its industry-leading growth in the cloud contact center applications market, competitive and feature-rich capabilities, and excellent customer support*

. . . Interactive Intelligence Group Inc., a global leader of cloud services for customer engagement, communications and collaboration, has received Frost & Sullivan's 2016 North American Cloud Customer Contact Center Applications Growth Excellence Leadership Award.

According to the award report, Frost & Sullivan selected Interactive Intelligence for "***its industry-leading growth in the cloud contact center applications market***, competitive and feature-rich capabilities, and excellent customer support."

***The report highlights Interactive's growth strategy, and particularly its latest cloud solution, PureCloud®, which has accelerated that growth***: "With PureCloud, the company has introduced a full-featured contact center and business communications offering that is simple, scalable, and affordable.  Indeed, the company priced this offering to disrupt the market."

PureCloud is a public cloud offering based on microservice architecture and built atop the scalable Amazon Web Services Cloud.  Interactive Intelligence also offers a private cloud solution, Communications as a Service$^{SM}$ (CaaS).

The report states ***that Interactive's growth is sustained because of its healthy roadmap of product enhancements in the pipeline***: "The company continues to address current customer requirements and unmet needs through continual development of its CaaS, private cloud platform, and PureCloud."

Commending Interactive for its customer ownership experience, the award report states, "From the outset, when businesses start to work with Interactive Intelligence, the company strives to understand the breadth of business needs, matching them with its contact center capabilities, but also the greater business.  The company's cloud platforms enable customers to also utilize its breadth of telephony and UCC applications, and content management capabilities, which are fully integrated across platforms."

### ***The Process Leading Up to the Acquisition***

56.     The process that ultimately led to the Acquisition began way back in 2011.

- 13 -

57.     In December 2011, Interactive engaged Union Square to advise and provide its perspectives on a variety of topics, including potential mergers and acquisitions, the capital markets environment, and other strategic alternatives.

58.     Shortly thereafter, Interactive's Board directed Union Square to engage in strategic partnership discussions with various partners, including Genesys.

59.     From March 2012 to May 2012, meetings and discussions were held involving Interactive Intelligence, Union Square, Genesys and Permira Advisers LLC ("Permira"), the majority owner of Genesys.  Interactive and Genesys even executed a mutual non-disclosure agreement on May 15, 2012, which facilitated confidential communications and the exchange of sensitive, non-public information.

60.     On June 19, 2012, Genesys submitted a preliminary indication of interest to acquire Interactive Intelligence for $38.00 per share.

61.     The Board did not accept Genesys' first offer.  Nonetheless, informal discussions were thereafter held from time to time between Genesys and Permira, on the one hand, and Interactive Intelligence and Union Square, on the other hand, regarding a potential transaction.

62.     In mid-2015, Interactive and Genesys resumed serious conversations about a potential deal.  Specifically, on May 5, 2015, Brown met with Genesys' CEO to discuss a potential merger.

63.     Over the course of the next 15 months, representatives of Interactive and Genesys held numerous discussions about a potential merger.  During those negotiations, Interactive effectively conveyed a price ceiling by suggesting that any offers had to exceed $60 per share.

64.     In August 2016, after it had previously submitted an offer of $62 per share, Genesys offered to buy the Company for $60.50 per share.  The Board promptly accepted, and Interactive and Genesys finalized definitive documentation.

### *The Acquisition*

65.     On August 31, 2016, Interactive and Genesys announced that they had entered into the Merger Agreement, under which Genesys, through Parent and Merger Sub, would acquire all of

- 14 -

the outstanding shares of Interactive common stock for $60.50 per share in cash.  In total, the Acquisition implied an equity value of approximately $1.4 billion.

66.     Interactive's financial advisor in connection with the Acquisition was Union Square, which has an extensive relationship with Permira and which earned approximately $17.5 million in connection with the Acquisition.

67.     The Acquisition was conditioned on, among other things, approval by a majority of Interactive's outstanding shares.

68.     On October 4, 2016, Interactive filed the Proxy Statement, which announced that the stockholder vote on the Acquisition would occur at the Company's headquarters located at 7601 Interactive Way, Indianapolis, Indiana 46278, on Wednesday, November 9, 2016 at 9:00 a.m.  The Proxy Statement also contained a recommendation from the Board that Interactive stockholders vote "FOR" the Acquisition.

69.     On November 9, 2016, Interactive filed a Form 8-K with the SEC, announcing that a majority of the Company's outstanding shares had been voted in favor of Acquisition.

70.     On December 1, 2016, the Acquisition was completed.

### *The Proxy Statement Was Materially Misleading and Inadequate*

71.     In violation of the federal securities laws, Defendants filed and/or authorized or caused the filing of a Proxy Statement that was materially false and misleading.  More specifically, as detailed herein, the Proxy Statement was materially misleading because it deceived Interactive stockholders regarding the Company's prospects.

72.     *First*, the Proxy Statement was materially misleading because its presentation of Interactive's outlook, as quantified by the financial projections on page 48 of the Proxy Statement, deceived stockholders as to the Company's true prospects.

73.     The Proxy Statement disclosed a set of financial projections – labeled "Certain Interactive Intelligence Unaudited Prospective Financial Information" – that were created by Interactive's management for calendar years 2016 through 2018.  The Proxy Statement does not detail when the financial projections were created.  Given the timing of the Acquisition, however,

- 15 -

these financial projections included only the last six months of 2016.  Thus, only 2.5 years were forecast by the 2016-2018 financial projections disclosed in the Proxy Statement.  These financial projections assumed significance in the Board's purported deliberations, and they were also significant in stockholders' evaluations of the Acquisition.

74.     The Proxy Statement stated that the Board deemed the Acquisition "advisable and in the best interests of Interactive Intelligence and its shareholders . . . ."  Elsewhere, the Proxy Statement similarly stated, the Board "determined that the transactions contemplated by the merger agreement are fair to, advisable and in the best interests of Interactive Intelligence and its shareholders and resolved to recommend that Interactive Intelligence shareholders vote in favor of the proposal to approve the merger agreement."  In support of the Board's purported conclusion, the Board cited, among other things:

- *The value represented by the merger* relative to other alternatives Interactive Intelligence might pursue, *taking into account*:

  - *the board of directors' and the Independent Committee's understanding of Interactive Intelligence's business*, historical and current financial performance, operating environment, management team, operations and competitive dynamics in Interactive Intelligence's industries and markets, including their impact on *Interactive Intelligence's future prospects*; and

  - the risks and uncertainties associated with continuing to operate as an independent public company, including with respect to succession planning and the *execution of Interactive Intelligence's strategic plan* (particularly the difficulties associated with Interactive Intelligence's transition as an independent public entity to becoming a leading provider of cloud solutions), and *Interactive Intelligence's likely ability and timeframe to achieve valuations superior to the proposed transaction*.

75.     The Proxy Statement also explained on page 47 that:

The updated forecasts were used as the basis for the financial analyses summarized below and presented to the Independent Committee of the board of directors and the Interactive Intelligence board of directors by Union Square, which we refer to as the Forecasts. The Forecasts were also provided to the Interactive Intelligence board of directors and to interested parties in connection with the interested parties' due diligence review of a possible transaction.

76.     The Proxy Statement also touted financial analyses performed by Union Square described on pages 48-57 of the Proxy Statement, including DCF, which is summarized on page 55

- 16 -

and 56 of the Proxy Statement and is widely recognized as the preeminent valuation analysis. Specifically, the Proxy Statement provides that the Board considered important:

> [T]he oral opinion of Union Square, subsequently confirmed in writing, that as of August 30, 2016, and based upon and subject to the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of review undertaken by Union Square as set forth in the written opinion, the merger consideration to be received by the holders of shares of Interactive Intelligence common stock (other than excluded shares) pursuant to the merger agreement was fair, from a financial point of view, to such holders . . . .

77.     These statements, viewed in conjunction with the financial projections, render the Proxy Statement materially misleading.

78.     By disclosing projections only through 2018 – regardless of whether any longer-range projections existed – Defendants concealed the fact that Interactive expects explosive growth to occur well beyond 2018 due to the functional superiority, scalability, and profitability of its recently launched PureCloud.  The truncated disclosure implies that Interactive's business was expected to level off after 2018, which is objectively and subjectively false.

79.     Interactive's public statements about the development of PureCloud demonstrate that it has long-term potential and, moreover, that the Company itself contemplates PureCloud as having long-term commercial sustainability.  Specifically, the Company announced in June of 2014 that it had already invested considerable R&D resources into developing PureCloud.  Moreover, the startup approach that Interactive took to develop PureCloud show that the Company contemplated a very long-term return on investment.

80.     As defendant Brown stated during a February 1, 2016 conference call:

> As you know, we've made significant investments to develop this entirely new cloud platform.  We weren't content with being a niche player in the communications market and decided to take an audacious step.  We gave our architects and designers the green light to start over from scratch and build the most advanced set of cloud based communications services on the market.  That effort culminated in the release of PureCloud in the middle of last year.

81.     More recent statements by the Company also demonstrate that the 2016 to 2018 projections period misleadingly conceals the Company's long-term prospects.

82.     For example, the Company has repeatedly stated that it recognizes revenues from PureCloud on a deferred basis, meaning that the growth in PureCloud customer are not reflected in

- 17 -

1239887_1

the Company's financial results until much later.  In fact, during an August 1, 2016 conference call, Interactive Chief Financial Officer Ashley Vukovits cautioned: "Please remember that the real revenue effect of even or higher than expected PureCloud sales will not be seen until 2017, and beyond."

83.     The Company has also stated that, despite PureCloud's early success, the platform is only in its infancy, and that the true potential will not be realized until well into the future.  On August 1, 2016, Brown stated, "We're in the early stages of disrupting the customer engagement marketplace with PureCloud . . . ."

84.     The Board knew that the business would continue to develop well beyond 2018 because of all of the Individual Defendants except Daniels have served on the Board since the initiation of PureCloud's development.  Moreover, all of the Individual Defendants have served on the Board since January 1, 2016, when the Company (presumably with Board authorization) decided to make PureCloud the focal point of Interactive's business.  Further, the Proxy Statement's discussion of the background of the Acquisition demonstrates the Board's knowledge of the Company's long-term strategic plan.

85.     Specifically, the Proxy Statement discloses that a Board meeting occurred on November 8, 2015 during which the Board cited a commitment to Interactive's "strategic plan" as a reason for not accepting an offer that Genesys had made shortly before that meeting.  According to the Proxy Statement, the Board also discussed Interactive's strategic plan at a regularly scheduled meeting held on May 19, 2016.

86.     Members of the Board also reviewed the strategic plan during June and July of 2016, according to the Proxy Statement.  Accordingly, the Board was fully aware that Interactive's strategic plan extended well beyond 2018, so the Board knew that presenting a truncated version of Interactive's future provided a misleading view of the Company's prospects.

87.     Further, Union Square has advised the Board since 2011, and on page 49 of the Proxy Statement provides that Union Square did numerous things to become familiar with the Company's business, including, among other things:

- 18 -

(i) Reviewed certain publicly available financial statements and other business and financial information of Interactive Intelligence;

(ii) Reviewed certain internal financial statements and other financial and operating data concerning Interactive Intelligence;

(iii) Reviewed certain financial projections and forecasts prepared by Interactive Intelligence management (*see* "– *Certain Interactive Intelligence Unaudited Prospective Financial Information*");

(iv) Reviewed certain financial projections and forecasts prepared by Wall Street research analysts regarding Interactive Intelligence; and

(v) Discussed the past and current operations and financial condition of Interactive Intelligence, as well as the prospects of Interactive Intelligence, with senior executives of Interactive Intelligence.

88.     In sum, Interactive has consistently discussed the extensive investment in R&D required for the launch of PureCloud.  The Company has also declared that it would be continuing to expand PureCloud's geographic reach as well as the applications available for use within the PureCloud platform.  Interactive has also stated that, unlike its other offerings, revenue from PureCloud will not be recognized until well after the Company records a sale.  Moreover, the same month the Merger Agreement was signed, Interactive has stated that PureCloud is still in its "early stages."  Accordingly, to espouse a set of financial projections that ends just two years later unnecessarily cuts short the Company's outlook and deceives stockholders into believing that what was presented in the Proxy Statement adequately describes the Company's long-term prospects. This renders the Proxy Statement materially misleading.

89.     ***Second***, the Proxy Statement was also materially misleading because it included only an enterprise-level summary of Interactive's financial projections and failed to provide any information about the Company's specific lines of business.

90.     Specifically, under the heading Certain Interactive Intelligence Unaudited Prospective Financial Information," the Proxy Statement discloses on page 48 Interactive's forecasts, as created by the Company's management, for revenue, adjusted EBITDA, depreciation, capitalized software, adjusted EBIT, amortization of intangibles, share-based compensation, EBIT, and unlevered free cash flow.  These figures are given only for Interactive as a whole, at the broader enterprise level. No detail is provided for any of the Company's individual businesses, nor is there any way to

- 19 -

ascertain from any other information in the Proxy Statement the prospects of the different components of the business.

91.     The Proxy Statement's presentation of enterprise-level forecasts, devoid of any information about the Company's specific business components, misled stockholders into believing that each of Interactive's businesses will grow at comparable levels, but that is false and misleading.

92.     The Company's business includes (i) an on-premises, all-in-one omnichannel customer engagement software suite (CIC), (ii) a single-tenant, all-in-one omnichannel customer engagement cloud service (CaaS), and (iii) PureCloud.  The three businesses feature markedly different financial attributes and radically different growth profiles.  Presentation of Interactive's business as a singular, monolithic entity conceals the markedly different prospects for each of the Company's business lines.

93.     Specifically, as alleged above, PureCloud is a high-margin business that was launched only recently, and it promises tremendous growth well into the future.

94.     By contrast, Interactive's other businesses involve lower margins and are expected to dwindle both as new customers gravitate toward PureCloud and as existing customers migrate over to PureCloud.  Indeed, numerous customers – more, in fact, than expected – have already transitioned from Interactive's lower margin products over to the highly profitable PureCloud, and the Company has publicly stated that it hopes that other legacy customers continue to transition over to PureCloud.

95.     Accordingly, because of the disparate potential for profit across Interactive's business lines, as well as the fact that the distribution of customers across businesses is changing and will continue to change, the Company should have disclosed its financial projections by product line.  By not doing so, Defendants misled stockholders about the true nature of Interactive's prospects for growth.

96.     ***Third***, the Proxy Statement is also misleading because it deceptively touts Union Square's financial analyses, namely, its DCF analysis, as supporting the Board's assertion that the Acquisition was fair.  As stated above in paragraph 75, the Board expressly cites Union Square's

opinion as a reason for determining that the Acquisition was fair to Interactive stockholders.  And on pages 55 and 56 of the Proxy Statement, Union Square's DCF analysis is summarized in high-level fashion.  However, as disclosed on page 55, Union Square utilized the perpetuity growth rate, as opposed to the terminal multiple method, in performing its DCF analysis, and this objectively wrong.

97.     Both the Board and Union Square were fully aware of the Company's extraordinary growth potential beyond 2018, yet they relied on an approach that assumes minimal growth beyond 2018.  In particular, Union Square applied perpetuity growth rates ranging from 3.5% to 4.5%, but PureCloud's meteoric growth profile belies applying such a conservative growth rate.

98.     Union Square should have used the terminal multiple method, which is more suitable when companies such as Interactive have not yet reached a steady-state level of growth.

99.     The Proxy Statement is also misleading because the DCF used financial projections that the Board and Union Square knew did not accurately reflect the Company's growth potential, for the reasons discussed above.

100.     Because Union Square provided, and the Board touted, misleading financial analyses, the Proxy Statement is, thus, materially false and misleading.

101.     Interactive, the Board, and Genesys are all responsible for the filing of the materially misleading Proxy Statement.  Interactive filed it, the Board authorized its filing and provided the false and misleading purported reasons for the Acquisition, and Genesys all but controlled its contents.  Under Section 5.4 of the Merger Agreement, Interactive had to prepare the Proxy Statement "in consultation" with Parent.  Moreover, the Company was obligated to give Parent the opportunity to comment on the Proxy Statement, and Interactive had to consider any comments made by Parent concerning the Proxy Statement.  The Merger Agreement also required Interactive to involve Parent in any communications it might have with the SEC concerning the Proxy Statement.

- 21 -

***Interactive Stockholders Were Harmed as a Result of Defendants' Misconduct***

102.    Plaintiff and the rest of the Class members were harmed as a result of approving the Acquisition in reliance upon the materially misleading and deficient Proxy Statement.  Indeed, Defendants disseminated the Proxy Statement as a means of depriving Interactive stockholders

103.    The Acquisition appears to be timed to take advantage of a temporary decrease in profits in the Company's business, as it has recently and now successfully gone through a transition to move its products to the cloud and, specifically, the revolutionary PureCloud system.  Indeed, any reduction in bottom-line financials (*i.e.*, operating and net profit/loss) is due solely to the recent uptick in R&D spending, which was done to launch PureCloud and which the Company has already stated will decline now that PureCloud has officially launched.

104.    The Acquisition also provided outsized benefits to Genesys.  As highlighted in the press release announcing the Acquisition:

(a)    Acquiring Interactive would allow Genesys "to Create the World's Premier Omnichannel Customer Experience Company";

(b)    The Acquisition "Extends [Genesys'] Global Market Leadership and Product Portfolio"; and

(c)    "This transaction will accelerate Genesys' ability to execute on its mission of powering the world's best customer experiences at scale, anytime, anywhere – over any channel, in the cloud and on-premise."

105.    The Acquisition is also the product of a fundamentally unfair process that was designed to ensure the sale of Interactive to Genesys on terms preferential to Genesys and Interactive's Board members and management, but detrimental to Plaintiff and other Interactive shareholders.  The process leading to the Acquisition was tainted by conflicts, tilted toward Genesys and driven by Interactive's Board and executive management, who collectively own more than 4.8 million shares of Interactive stock.  For the Board and Company management, the Acquisition provides a liquidity event for their large illiquid Interactive holdings.  If the Acquisition closes,

members of the Board and Company management will receive **over $292 million** from their sale of their shares of Interactive stock.

106.    The Acquisition also sold stockholders short while providing Interactive's officers and directors with millions of dollars in special payments – not being made to ordinary shareholders – for currently unvested stock options, performance units, and restricted shares, all of ***which shall, upon the merger's closing, become fully vested and exercisable***.   The Company's senior management is also entitled to receive from the Acquisition over $20.9 million in change-of-control payments.   Moreover, the Company's management appears to be staying on board for the long term after the Acquisition.   As reported in the press release announcing the Acquisition, Interactive's senior management team was expected to remain with the new organization after the Acquisition was completed.

107.    The Acquisition is also unfair because it resulted from a process that was fundamentally flawed and unfair.   While the Board conducted what appeared to be a "process," they breached their duties in a number of ways, and in two that are significant.   First, in July 2016, the Board directed its financial advisor to send potential bidders a process letter that, among other things, advised bidders that its bottom line was $60.00 per Interactive share.   By so doing, rather than maximizing stockholder value, the Board capped whatever stockholders could hope to receive. It is certainly no surprise then that the final price the Board accepted was a wholly inadequate $60.50 per share.   Second, on July 19, 2016, Genesys submitted its preliminary indication of interest at $62.00, but ultimately dropped that bid back down to $60.00 per share.   Rather than insisting on $62.00 per Company share or higher, the Board members capitulated and took the $60.50 per share Genesys ultimately offered out of their own selfish liquidity interests.

108.    The Acquisition price of $60.50 per share is also unfair, as the Board failed to obtain maximum value and adequately compensate shareholders.   The Acquisition price of $60.50 represents a miniscule 7% premium to the closing price of Interactive common stock on the day before the deal was announced.   According to Yahoo! Finance, at least one analyst has set a price

target for Interactive stock at $67.00 per share.  In the last three years, Interactive common stock traded as high as $81.59 per share on March 4, 2014.

109.    Adding to the unfairness of the Acquisition – and suggesting conflict on the part of Brown and overreaching on the part of Genesys – is the fact that Genesys secured from Brown a commitment to support the Acquisition.  Specifically, on August 30, 2016, Brown and Genesys entered into a voting and support agreement (the "Voting Agreement"), under which Brown agreed to vote all of his shares in support of the Acquisition.

## COUNT I

### Against the Individual Defendants and Interactive for Violations of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder

110.    Plaintiff repeats and realleges each allegation as if fully set forth herein.

111.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

112.    Defendants prepared, reviewed and/or disseminated the false and misleading Proxy Statement which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

113.    As stated herein, the Proxy Statement contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, which the Proxy Statement was an essential link in the consummation of the Acquisition.  Defendants have also failed to correct the Proxy Statement and the failure to update and correct false statements is also a violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

114.    The written communications made by the defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner.

115.    As a direct result of Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy Statement, Plaintiff and the class were induced to vote their shares and accept inadequate consideration of $60.50 per share in connection with the Acquisition.  The false and/or misleading Proxy Statement used to obtain shareholder approval of the Acquisition deprived plaintiff and the class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Interactive shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy Statement, defendants were aware of and/or had access to the true facts concerning Interactive's true value, which was far greater than the $60.50 per share Interactive's shareholders received.  Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy Statement defendants used to obtain shareholder approval of and thereby consummate the Acquisition, Plaintiff and the class have suffered damage and actual economic losses (i.e., the difference between the price Interactive shareholders received and Interactive's true value at the time of the Acquisition) in an amount to be determined at trial.

116.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statement and in other information reasonably available to shareholders.

117.    By reason of the misconduct detailed herein, the defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### Against the Individual Defendants, Parent, Merger Sub, Lux 3, Holdings I and Holdings II for Violation of Section 20(a) of the 1934 Act

118.    Plaintiff repeats and realleges each allegation set forth herein.

- 25 -

119.    The Individual Defendants acted as controlling persons of Interactive within the meaning of §20(a) of the 1934 Act.

(a)    By virtue of their positions as officers and/or directors and/or controlling shareholders of Interactive, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

(b)    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

(c)    The Proxy Statement details the Individual Defendants' involvement in negotiating, reviewing, and approving the Merger Agreement and preparation of the Proxy Statement.

(d)    The Proxy Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.  They were thus directly involved in the making of this document.

(e)    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the 1934 Act.

120.    Genesys (including Parent, Merger Sub, Lux 3, Holdings I, and Holdings II) are a controlling person of Interactive and the Individual Defendants within the meaning of Section 20(a) of the 1934 Act.  By reason of its contractual obligations with Interactive, the Individual Defendants, Genesys possessed control over Interactive and the Individual Defendants.

(a)    As a condition of the Merger Agreement, and pursuant to the Support Agreements, defendant Brown irrevocably appointed Parent and his proxy to vote his shares of the Company's common stock in favor of the Acquisition.

- 26 -

(b)      Interactive and the Individual Defendants were required by Section 5.1 of the Merger Agreement to refrain from changing the operation of the Company's business or engaging in a variety of activities without the express written consent of Genesys.

(c)      Pursuant to Section 5.1(a) of the Merger Agreement, Interactive was not permitted to change the record date for the shareholder meeting on the Acquisition without the Buyer Defendants' prior written consent.

(d)      Pursuant to Section 5.4 of the Merger Agreement, Interactive had to prepare the Proxy Statement "in consultation" with Parent.  Moreover, the Company was obligated to give Parent the opportunity to comment on the Proxy Statement, and Interactive had to consider any comments made by Parent concerning the Proxy Statement.  The Merger Agreement also required Interactive to involve Parent in any communications it might have with the SEC concerning the Proxy Statement.

(e)      By reason of such conduct, Parent, Merger Sub, Lux 3, Holdings I, and Holdings II are liable pursuant to Section 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive and monetary relief, in Plaintiff's favor and in favor of the Class and against defendants, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Declaring that defendants violated the federal securities laws as alleged herein by disseminating the Proxy Statement in connection with the Acquisition, which contains materially false and misleading information about the Acquisition;

C.      Rescinding the Acquisition, or, in the alternative, if rescission is not feasible, awarding rescissory damages;

D.      Awarding Plaintiff and the Class damages;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable and monetary relief as this Court may deem just and proper.

G.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 27, 2017                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                             DAVID T. WISSBROECKER
                                             EDWARD M. GERGOSIAN


                                             s/ DAVID T. WISSBROECKER
                                             DAVID T. WISSBROECKER

                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)
                                             DWissbroecker@rgrdlaw.com
                                             EGergosian@rgrdlaw.com

                                             Lead Counsel for Plaintiff

                                             GEORGE & FARINAS, LLP
                                             KATHLEEN A. FARINAS
                                             LINDA GEORGE
                                             151 N. Delaware Street, Suite 1700
                                             Indianapolis, IN 46204
                                             Telephone:  317/637-6071
                                             kf@lgkflaw.com
                                             lg@lgkflaw.com

                                             Local Counsel

                                             JOHNSON & WEAVER, LLP
                                             FRANK J. JOHNSON
                                             600 West Broadway, Suite 1540
                                             San Diego, CA  92101
                                             Telephone:  619/230-0063
                                             619/255-1856 (fax)

- 28 -

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/802-1486
212/602-1592 (fax)

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 27, 2017.

s/ DAVID T. WISSBROECKER
DAVID T. WISSBROECKER

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  DWissbroecker@rgrdlaw.com

1239887_1

# Mailing Information for a Case 1:16-cv-03161-SEB-TAB TRAHAN v. INTERACTIVE INTELLIGENCE GROUP INC., ET AL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kathleen A. Musgrave Farinas**
  GEORGE & FARINAS, LLP
  kf@lgkflaw.com,tm@lgkflaw.com

- **David K. Herzog**
  FAEGRE BAKER DANIELS LLP (Indianapolis)
  david.herzog@faegrebd.com,lisa.duboise@faegrebd.com

- **Daniel R. Kelley**
  FAEGRE BAKER DANIELS LLP (Indianapolis)
  daniel.kelley@faegrebd.com,shannon.bennett@faegrebd.com

- **John R. Maley**
  BARNES & THORNBURG LLP (Indianapolis)
  jmaley@btlaw.com,dscott@btlaw.com,creed@btlaw.com,roxanne.larrison@btlaw.com

- **Justin R. Olson**
  FAEGRE BAKER DANIELS LLP (Indianapolis)
  justin.olson@FaegreBD.com,deb.lee@FaegreBD.com

- **David T. Wissbroecker**
  ROBBINS GELLER RUDMAN & DOWD LLP
  dwissbroecker@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Paul A. Wolfla**
  FAEGRE BAKER DANIELS LLP (Indianapolis)
  paul.wolfla@faegrebd.com,lisa.duboise@faegrebd.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`