UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KARL TRAHAN Individually and on Behalf of<br>All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-03161-SEB-MPB |
| | ) | |
| INTERACTIVE INTELLIGENCE GROUP, INC., | ) | |
| DONALD E. BROWN, | ) | |
| MITCHELL E. DANIELS, | ) | |
| EDWARD L. HAMBURG, | ) | |
| MICHAEL C. HEIM, | ) | |
| MARK E. HILL, | ) | |
| RICHARD A. RECK, | ) | |
| GENESYS TELECOMMUNICATIONS | ) | |
| LABORATORIES, INC., | ) | |
| GIANT MERGER SUB, INC., | ) | |
| GREENEDEN LUX 3 S.aR.L., | ) | |
| GREENEDEN U.S. HOLDINGS I, LLC, | ) | |
| GREENEDEN U.S. HOLDINGS II, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS (DKTS. 39, 41)

Plaintiff Karl Trahan ("Trahan") was a shareholder of Interactive Intelligence

("Interactive"),[1] an Indiana corporation, before it was acquired in a cash-out merger ("the

Merger") by Genesys ("Genesys"),[2] a California corporation. Trahan has now filed this

---

[1] In full, Interactive Intelligence Group, Inc.

[2] In full, Genesys Telecommunications Laboratories, Inc. Included under "Genesys" are several
of the company's subsidiaries and affiliates, defendants here, to wit: Giant Merger Sub, Inc., an
Indiana corporation; Greeneden Lux 3 SARL, a Luxembourgish société à responsabilité limitée;
Greeneden U.S. Holdings I, LLC, a Delaware limited liability company; and Greeneden U.S.
Holdings II, LLC, also a Delaware limited liability company.

putative class action,[3] on behalf of himself and others similarly situated, against both companies and Interactive's board of directors ("the Directors")[4] under the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78a *et seq.*, for issuing a false and misleading proxy solicitation statement ("the Proxy Statement") in connection with Interactive's shareholders' approval of the Merger.

Now before the Court are motions to dismiss Trahan's *Amended Complaint*, Dkt. 32, under Rule 12(b)(6), Fed. R. Civ. P., filed by the Directors, Dkt. 39, and by Interactive and Genesys, Dkt. 41, which join the Directors' motion and argument in whole. We therefore consider the two motions together as one. For the reasons below, the motions are granted.

## Factual and Procedural Background

Trahan's *Amended Complaint* alleges the following, which we take as true for the purposes of the instant motions. Interactive was a technology company that "provide[d] unified business communications solutions for call centers, enterprise IP telephony, and business process automation." Am. Compl. ¶ 34. Interactive cultivated three main business lines: its "Customer Interaction Center ('CIC') business[,]" *id.* ¶ 35, its

---

[3] While neither party raises the point, we note that "Rule 23(c) of the Federal Rules of Civil Procedure provides that the district court must address class certification 'early' in the litigation and generally before addressing a motion directed at the merits. But there is no fixed requirement that the court must *always* defer a decision on a Rule 12(b)(6) motion until after the court addresses class certification. . . . [A]lthough a Rule 12(b)(6) dismissal operates as a final decision on the merits if leave to replead is not granted, it is sometimes appropriate to decide a Rule 12(b)(6) motion ahead of class certification." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 n.4 (7th Cir. 2012) (citations omitted). We find it appropriate here.

[4] The Directors are Donald E. Brown ("Brown"), chairman; Mitchell E. Daniels; Edward L. Hamburg; Michael C. Heim; Mark E. Hill; and Richard A. Reck.

"Communications as a Service ('CaaS') business[,]" *id.* ¶ 36 and a "next generation cloud communication platform" called "PureCloud." *Id.* ¶ 38. As of 2015, Interactive's CIC and CaaS businesses were "legacy" businesses, *id.* ¶ 44, for which Interactive did not anticipate substantial future growth, in view of changing technological and market conditions. In view of these same conditions, however, Interactive hoped the PureCloud business would show "explosive," *id.* ¶¶ 6, 78, "tremendous," *id.* ¶¶ 7, 43, 93, "huge," *id.* ¶ 45, "extraordinary," *id.* ¶ 97, "meteoric" growth. *Id.*

PureCloud was announced by press release in June 2014. The first PureCloud product was released in January 2015. By January 2016, PureCloud was "the focal point of Interactive's business." *Id.* ¶ 43. On a February 1, 2016, earnings call,[5] Brown explained,

> [W]e believe we can package all of [PureCloud's features] at price points that our competitors can't touch, deploy [them] in timeframes that they can't match, and yet do so at 70 to 80 point margins that will make us nicely profitable in the years ahead. . . . We are ready to . . . dominate our industry.

*Id.* ¶ 48. Interactive's industry indeed responded favorably to PureCloud, honoring it for excellence and innovation. *Id.* ¶¶ 51–52, 55. The market's response was favorable as well. In an August 1, 2016, press release, Brown pointed to a 13 percent year-on-year increase in total revenues and accelerating growth in the PureCloud customer base. Interactive "had 24 PureCloud customers at the end of [2015]. Six months later we had

---

[5] The *Amended Complaint* quotes a number of earnings call transcripts and press releases without citations. The Directors have supplied them in table form. Br. Supp. Mot. Dismiss (Dkt. 40) 42–45.

well over 300[,]" including 204 new customers in the second quarter of 2016 alone. *Id.* ¶ 54.

Interactive had occasionally considered "strategic partnership[s]" with other firms since 2011, *id.* ¶ 58, but for various reasons those plans had not come to fruition. In mid-2015, however, merger discussions with Genesys began in earnest. "Over the next 15 months, representatives of Interactive and Genesys held numerous discussions about a potential merger." *Id.* ¶ 63. Interactive retained Union Square Advisors ("Union Square") as its financial advisor on the deal. In August 2016, Interactive and Genesys concluded an agreement whereunder Genesys would acquire Interactive in a cash-out merger at the price of $60.50 per share, subject to the approval of Interactive's shareholders. Union Square supplied a fairness opinion finding the price was fair from a financial point of view to such shareholders. The Merger was announced publicly on August 31, 2016.

The Proxy Statement[6] was filed on October 4, 2016, announcing a special shareholders' meeting on November 9, 2016, for a vote on the Merger and soliciting the shareholders' favorable proxies. Chairman Brown's introductory statement affirmed that,

> [a]fter consideration of, and based upon, the unanimous
> recommendation of a special committee of the board of
> directors consisting entirely of independent and disinterested
> directors . . . , the [Directors] ha[ve] unanimously approved

---

[6] The Directors have attached the Proxy Statement to their motion to dismiss, Dkt. 40 Ex. 2, which we may and do consider, without converting the Directors' motion to one for summary judgment, as a document referred to in the *Amended Complaint* and central to Trahan's claim. *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) ("This rule is a liberal one—especially where, as here, the plaintiff does not contest the validity or authenticity of the extraneous materials."); *Himmel v. Bucyrus Int'l, Inc.*, No. 10-C-1104, 2014 WL 1406279, at *1 (E.D. Wis. Apr. 11, 2014) (on motion to dismiss § 14(a) claim, considering proxy statement attached by defendants).

> the [M]erger . . . , determined that the transactions
> contemplated by the [M]erger agreement are fair to, advisable
> and in the best interests of [Interactive] and its shareholders
> and resolved to recommend that [Interactive] shareholders
> vote in favor of the [Merger].

Dkt. 40 Ex. 2, at 5–6;[7] *also id.* at 7 (introductory statement of Interactive CFO) ("fair to,

advisable and in the best interests of [Interactive] and its shareholders"), 43 (Directors'

recommendation) ("fair to, advisable and in the best interests of [Interactive] and its

shareholders"). The Directors' stated reasons for this determination included

consideration of

> [t]he value represented by the [M]erger relative to other
> alternatives [Interactive] might pursue, taking into account . .
> . the risks and uncertainties associated with continuing to
> operate as an independent public company, including with
> respect to succession planning and the execution of
> [Interactive's] strategic plan (particularly the difficulties
> associated with [Interactive's] transition as an independent
> public entity to becoming a leading provider of cloud
> solutions), and [Interactive's] likely ability and timeframe to
> achieve valuations superior to the proposed transaction[.]

*Id.* at 55 ("Reasons for [the Directors'] Recommendation to Vote in Favor of the

Merger"). The Directors further justified their recommendation by pointing to the 36

percent premium represented by the $60.50 share price relative to "the closing price of

$44.49 per share on July 28, 2016, the last full trading day before media reports regarding

a potential transaction [appeared]." *Id.*

The Proxy Statement included a section presenting "Certain [Interactive]

Unaudited Prospective Financial Information," which the Proxy Statement referred to as

---

[7] The Proxy Statement is cited according to its CM/ECF filing pagination.

"the Forecasts," *id.* at 59, and which Trahan's complaint refers to as "the financial projections." *E.g.,* Am. Compl. ¶ 6. We refer to them as "the Management Forecasts." These consisted of "certain non-public unaudited prospective financial information prepared by [Interactive] management . . . updated in the third quarter of 2016." Dkt. 40 Ex. 2, at 59. The Management Forecasts were presented to the Directors in evaluating the Merger and to Union Square in preparing its fairness opinion. The Proxy Statement summarized the Management Forecasts in table form, as follows:

| | 6 Months Ending December 31, 2016 | Calendar Year Ending December 31, | | |
| | | 2016 | 2017 | 2018 |
| | | (dollars in millions) | | |
| Revenue | $ 221.9 | $ 430.0 | $ 469.6 | $ 551.5 |
| Adjusted EBITDA (non-GAAP)(1) | $ 23.4 | $ 28.0 | $ 58.8 | $ 111.7 |
| *Less* : Depreciation | $ 10.6 | $ 19.1 | $ 16.9 | $ 13.8 |
| *Less* : Amortization of Capitalized Software | $ 3.9 | $ 7.7 | $ 6.9 | $ 6.3 |
| Adjusted EBIT (non-GAAP)(2) | $ 8.9 | $ 1.2 | $ 35.0 | $ 91.6 |
| *Less* : Amortization of Intangibles | $ 1.2 | $ 3.7 | $ 2.5 | $ 2.5 |
| *Less* : Share-based Compensation | $ 9.7 | $ 18.8 | $ 20.3 | $ 22.7 |
| *Less* : Other Adjustments | $ 0.0 | $ (1.3) | $ 0.0 | $ 0.0 |
| EBIT (non-GAAP)(3) | $ (2.0) | $ (20.1) | $ 12.2 | $ 66.4 |
| Unlevered Free Cash Flow(4) | $ 8.2 | $ 7.7 | $ 26.1 | $ 72.5 |

*Id.* at 60.[8]

The Proxy Statement also included a section presenting the "Opinion of [Interactive's] Financial Advisor," *id.*, Union Square. Union Square's fairness opinion

---

[8] "(1) Adjusted EBITDA is earnings before interest, taxes, depreciation and amortization and also before share-based compensation expenses and certain other adjustments. (2) Adjusted EBIT is earnings before interest and taxes and also before share-based compensation expenses, amortization of intangibles and certain other adjustments. (3) EBIT is earnings before interest and taxes. (4) Derived as EBIT less taxes (less deferred portion), plus depreciation and amortization, less capital expenditures, less capitalized software development costs and less increases (or plus decreases) in net working capital. To account for future share dilution to current shareholders, share-based compensation is not added back in the calculation of unlevered free cash flow." *Id.* "[N]on-GAAP," *id.*, indicates that the Management Forecasts "were not prepared with a view to compliance with generally accepted accounting principles ['GAAP'] as applied in the United States[.]" *Id.* at 59.

was stated in brief,[9] alongside a summary of the financial analyses Union Square had conducted in reaching its opinion ("the Union Square Analysis"), which rested in part on the Management Forecasts. Among other data, the Union Square Analysis included a discounted cash flow (DCF) analysis,[10] resting entirely on the Management Forecasts, used "to value [Interactive] as a standalone entity." *Id.* at 67. "This analysis indicated an implied price per share of $38.52 to $62.68, as compared to the [M]erger consideration of $60.50 per share of [Interactive] common stock." *Id.* at 68.

At the November 9, 2016, special meeting, Interactive's shareholders approved the Merger by a majority of outstanding shares. This lawsuit was filed immediately thereafter, on November 18, 2016. The Merger closed on December 1, 2016. The now operative *Amended Complaint* was filed on February 27, 2017. Defendants' motions to dismiss under Rule 12(b)(6), Fed. R. Civ. P, have been fully briefed and are ripe for decision.

### Standard of Decision

A motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., tests the legal sufficiency of the complaint. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 n.4 (7th Cir. 2012). We accept all well pleaded facts as true and draw

---

[9] Union Square's full fairness opinion was distributed to shareholders as an appendix to the Proxy Statement. Dkt. 40 Ex. 2, at 211–14.

[10] "The DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value." *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 917 (Del. Ch. 1999) (quotations and footnote citation omitted).

all reasonable inferences in the plaintiff's favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008). We do not accept legal conclusions as true. *Yeftich*, 722 F.3d at 915. We will grant the motion if, after striking all conclusory allegations, the factual content of the complaint fails to state a claim to relief that is "plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim has facial plausibility where its factual allegations permit a reasonable inference of liability; speculative inferences of liability, or allegations merely consistent with liability, will not do. *Id.*

Further, complaints charging false or misleading statements under the federal securities laws are subject to heightened pleading requirements under the Private Securities Litigation Reform Act (PSLRA). 15 U.S.C. § 78u-4(b)(1); *Beck v. Dobrowski*, 559 F.3d 680, 681–82 (7th Cir. 2009). Such a complaint "shall specify" (1) "each statement alleged to have been misleading"; (2) "the reason or reasons why the statement is misleading"; and, if an allegation is made on information and belief, (3) "all facts" supporting the belief, "state[d] with particularity . . . ." 15 U.S.C. § 78u-4(b)(1).

<u>Analysis</u>

Trahan seeks to hold the Directors, Interactive, and Genesys liable under Section 19(a) and Section 20(a) of the Exchange Act. As explained below, the latter claim is derivative of the former, so our focus must be on Section 19(a).

## I. Section 19(a)

Section 19(a) prohibits solicitation of shareholder proxies in violation of Securities and Exchange Commission (SEC) rules. 15 U.S.C. § 78n(a)(1). SEC Rule 14a-9 prohibits

proxy solicitation by means of "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a-9(a). To prevail in a Section 19(a) action, a plaintiff must show that a false or misleading statement of material fact caused him injury. *Goldfinger v. Journal Commc'ns Inc.*, No. 15-C-12, 2015 WL 2189752, at *2 (E.D. Wis. May 8, 2015).

A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote[,]" *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 723 (7th Cir. 2016) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)), or, in other words, if there is "a substantial likelihood" that a reasonable investor would view the fact "as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449. Similarly, "whether a statement is 'misleading' depends on the perspective of a reasonable investor" viewed objectively. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015) (action for false or misleading registration statements) (citing *TSC Indus.*, 426 U.S. at 445).

Though not pure fact statements, statements of opinion, belief, or reasons for acting "are factual in two senses: as statements that the [speakers] do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092 (1994). When such statements both "misstate the speaker's [opinion or belief or reasons] and also

mislead about the stated subject matter . . . [,]" they are actionable as "knowingly false or misleadingly incomplete[,]" *id.* at 1095, or as both "subjectively" and "objectively" false. *Vallabhaneni v. Endocyte, Inc.*, No. 1:14-cv-1048, 2016 WL 51260, at *15 (S.D. Ind. Jan. 4, 2016) (quoting *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013)). The Seventh Circuit applies the same test of objective and subjective falsity, that is, whether "the statements [were] made in good faith and with a reasonable basis[,]" to forward-looking projections of future conditions or events. *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1333 (7th Cir. 1995) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994)).

Statements of opinion may also be actionably misleading "because a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion[.] . . . [I]f the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare*, 135 S. Ct. at 1328. Thus a statement of opinion, no matter whether sincerely held, may ground false-statement liability if it "omits material facts about the [speaker's] inquiry into or knowledge concerning [the] statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself[.]" *Id.* at 1329.

The false or misleading statements complained of must have caused plaintiff's injuries. Specifically, plaintiff must show that "the proxy solicitation itself, rather than the particular [alleged] defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Goldfinger*, 2015 WL 2189752, at *2 (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384–85 (1970)). The "causal sequence" described

by *Mills* is one "in which the solicitation links a directors' [*sic*] proposal with the votes legally required to authorize the action proposed." *Va. Bankshares*, 501 U.S. at 1102. Further, under the PSLRA, a plaintiff must show that the act or omission complained of "caused the loss for which the plaintiff seeks to recover damages[,]" 15 U.S.C. § 78u-4(b)(4), referred to by courts and by the PSLRA as "loss causation."

Section 14(a) liability is subject to the safe harbor established by the PSLRA for forward-looking statements when accompanied by meaningful cautions or when not made with actual knowledge of their false or misleading nature. 15 U.S.C. § 78u-5(c)(1)(A)(i); *id.* § 78u-5(c)(1)(B)(i), (ii)(II);[11] *see Beck*, 559 F.3d at 681–82 (PLSRA "is applicable" to Section 14(a) claims). First, no person is liable for a forward-looking statement if it is "identified as a forward-looking statement" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[.]" *Id.* § 78u-5(c)(1)(A)(i). On a motion to dismiss, a court "shall consider" forward-looking statements together with any cautionary statements accompanying them. *Id.* § 78u-5(e). Second, no person is liable for a forward-looking statement if "the plaintiff fails to prove" that it "was made with actual knowledge . . . that the statement was false or

---

[11] The safe harbor may also be reached by showing the statement to be "immaterial[,]" 15 U.S.C. § 78u-5(c)(1)(A)(ii), but because Trahan's underlying Section 14(a) action already requires materiality, separate consideration of this provision would be duplicative.

Trahan makes the fleeting argument that the safe harbor applies only in "fraud by hindsight" suits, which (unlike Trahan's case) allege that directors have caused the share price to fall by forecasting unrealistic revenues and then failing to meet the forecasts. As this argument finds no support in the statutory text or judicial precedent, we reject it. *See City of Hialeah Emps.' Ret. Sys. v. FEI Co.*, —F. Supp. 3d—, 2018 WL 561848, at *5 (D. Ore. 2018) (same).

misleading[.]" *Id.* § 78u-5(c)(1)(B)(i), (ii)(II). Stated thus disjunctively, "the unambiguous language" of the statute "immunize[s] [even] deliberate liars from liability" for "a forward-looking statement . . . plus an accompanying meaningful cautionary statement." *Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836, 843–44 (N.D. Ill. 2009) (citing *inter alia Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999)).

A forward-looking statement, generally speaking, is "one whose truth or falsity cannot be determined until after the statement has been made." *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 783 (N.D. Ill. 2006) (citing *Harris*, 182 F.3d at 805). Specifically, the statutory safe-harbor provision defines forward-looking statements to include "a statement containing a projection of revenues" or of similar financial data; "a statement of future economic performance"; "any statement of the assumptions underlying or relating to" either of the above type of statements; and "any report issued by an outside reviewer . . . to the extent that report assesses a forward-looking statement" of the entity retaining the outside reviewer. 15 U.S.C. §§ 78u-5(i)(1)(A), (C) through (E). *See Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues").

We turn to the case at bar in light of the above principles. The Directors aptly characterize Trahan's Section 14(a) claim as something of a "moving target . . . ." Reply Br. Supp. Mot. Dismiss (Dkt. 43) 1. Nevertheless, the heart of Trahan's objection to the Proxy Statement is this: Trahan faults the Directors for failing to provide the shareholders

with quantitative and qualitative predictions for Interactive's future success commensurate, in Trahan's estimation, with the Directors' public puffing about PureCloud. Trahan's complaint attempts to convert the Directors' public expressions of optimism about PureCloud into the Directors' knowledge of the inherently unknowable—PureCloud's, and Interactive's, future success—which the Directors concealed from Interactive shareholders in service of "their own selfish liquidity interests." Am. Compl. ¶ 107. This does not, either in outline or in detail, state an actionable violation of federal securities law.

In conjunction with his brief, Trahan's complaint may be fairly read to sustain the following theories of false-statement liability: the Management Forecasts were made misleading by the omission of longer-range financial projections; the Management Forecasts were made misleading by the omission of separate financial projections for each of Interactive's three business lines; the Union Square Analysis was subjectively and objectively false in its derivation of the terminal value for its DCF model; the Directors' statement of reasons for recommending approval of the Merger was subjectively and objectively false; and the Directors' statement of reasons for recommending approval of the Merger was unsupported by such investigation as a reasonable investor would expect under the circumstances, and failed to disclose that fact. On each of these theories, the *Amended Complaint* fails to state a Section 14(a) claim.

A. *Omission of Longer-Range Financial Projections from Management Forecasts*

Trahan faults the Directors for using the Management Forecasts to "deceive[] stockholders as to [Interactive's] true prospects[,]" Am. Compl. ¶ 72, "[b]y disclosing

projections only through 2018—regardless of whether any longer-range projections existed[,]" *id.* ¶ 78, thereby "conceal[ing] the fact that Interactive expect[ed] explosive growth to occur well beyond 2018 . . . . The truncated disclosure implie[d] that Interactive's business was expected to level off after 2018[.]" *Id.* We find these allegations sufficient to satisfy the PSLRA's pleading standards. However, they fail to plausibly allege a misleading omission of material fact. And, in any event, they are sheltered by the PSLRA safe harbor.

### 1.  Materiality

Trahan stands on firm ground insofar as the Seventh Circuit has rejected the contention that financial projections are always immaterial as a matter of law. *Stransky*, 51 F.3d at 1333. And in the context of a cash-out merger, "information regarding the financial attractiveness of the deal is of particular importance. This is because the stockholders must measure the relative attractiveness of retaining their shares versus receiving a cash payment, a calculus heavily dependent on the stockholders' assessment of the company's future cash flows." *Gottlieb v. Willis*, No. 12-CV-2637, 2012 WL 5439274, at *5 (D. Minn. Nov. 7, 2012) (quoting *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 199 (Del. Ch. 2007)); *also Goldfinger*, 2015 WL 2189752, at *4. *Accord Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010) ("[M]anagement's best estimate of the future cash flow of a corporation that is proposed to be sold in a cash merger is clearly material information.").

While financial projections may be material to cash-out merger decisions in general, however, Trahan's complaint in this case furnishes no basis to plausibly

conclude that *more* financial projections than were already supplied by the Management Forecasts (two and one-half years' worth, from the second half of calendar year 2016 through calendar year 2018) were substantially likely to have been viewed by a reasonable investor as having significantly altered the total mix of information available. The Proxy Statement itself cautions against any such reliance, notifying shareholders that the Management Forecasts were "subjective in many respects" and denying that their inclusion signaled either their materiality to Interactive or an "induce[ment to] any shareholder to vote in favor" of the Merger. Dkt. 40 Ex. 2, at 59.

To begin with, there is no allegation that a reasonable investor would expect a longer projection horizon than the two and one-half years projected by the Management Forecasts. In general, of course, the longer the projection period, the more speculative (and, therefore, the less useful) the projection, suggesting that the materiality of a projection must vary inversely with the length of the projection period. *See Himmel v. Bucyrus Int'l, Inc.*, No. 10-C-1104, 2014 WL 1406279, at *16 (E.D. Wis. Apr. 11, 2014) ("[T]he information the Complaint contends should have been disclosed in the Proxy was a ten-year projection, which by its length would appear to be speculative.").

But Trahan insists that only projections beyond 2018 (how far beyond, he does not tell us) would have "capture[d] the value of the PureCloud business[.]" Br. Opp. Mot. Dismiss (Dkt. 42) 19. No factual allegation supports this contention. Trahan points to an August 1, 2016, earnings call, the transcript of which was and is publicly available,[12]

---

[12] Again as indicated by the Directors. Br. Supp. Mot. Dismiss 45.

wherein an Interactive officer stated that "the real revenue effect of even or higher than expected PureCloud sales will not be seen until 2017, and beyond." Am. Compl. ¶ 82. But this does nothing for Trahan. First, Trahan mischaracterizes the import of the Interactive officer's statement. Fully two years separate "until 2017" from "after 2018," both of which years were covered by the Management Forecasts. Second, to the extent that PureCloud revenues would not be realized until 2017, Interactive did not conceal that expectation but publicly revealed it to the market in the earnings call cited by Trahan. Third, no special basis, such as would rest particularly within the Directors' "knowledge and expertness far exceeding the normal investor's resources," *Va. Bankshares*, 501 U.S. at 1092, appears for the conclusion that PureCloud revenues would not be realized until 2017. Rather, the only plausible reason for that conclusion is the plainly obvious one: PureCloud had just been released in 2015 and in 2016 its ultimate success *vel non* still lay in the future. That the value of PureCloud would only be fully realized in the future was an entirely obvious fact which, already at the time of the Merger, had been thoroughly folded into the total mix of information available to reasonable investors.

## 2. Subjective and Objective Falsity

Even assuming the materiality of the omitted information, however, Trahan's complaint does not permit the plausible inference that the Management Forecasts misstated the Directors' true opinion or misled about their subject matter. *See Va. Bankshares*, 501 U.S. at 1095. Accordingly, they were not made in bad faith and without a reasonable basis, *see Stransky*, 51 F.3d at 1333, were neither subjectively nor

objectively false, *see Vallabhaneni*, 2016 WL 51260, at *15, and therefore not actionably "misleadingly incomplete." *Va. Bankshares*, 501 U.S. at 1095.

Trahan has pleaded no facts as would plausibly suggest the Directors did not actually believe the Management Forecasts reflected a reasonable picture of Interactive's prospects absent longer-range projections, mindful that they "reflect[ed] numerous assumptions and estimates as to future events . . . that [Interactive] management believed were reasonable at the time the [Management Forecasts] were prepared[.]" Dkt. 40 Ex. 2, at 59. Trahan has pleaded no conspiracy or collusion between Interactive management and the Directors in the preparation of the Management Forecasts. Trahan's sole ground for suspicion is his feeling that the figures presented in the Management Forecasts were not commensurate with the Directors' hopeful, optimistic puffery about PureCloud. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425, 1427–28 (3d Cir. 1997 (Alito, J.) (puffery in context of securities law); *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013) (same). Trahan attempts to imply that, because the Directors were hopeful, and because Trahan feels the Directors were qualitatively more hopeful than the quantitative Management Forecasts, therefore the Management Forecasts were not presented in good faith. That attempt does not withstand scrutiny.

Further, omission of longer-range projections cannot have rendered the Management Forecasts misleading to a reasonable investor. To be sure, the Directors are wrong to dismiss Trahan's demand for longer-range projections as a "tell me more" pleading to be rejected out of hand. *Compare Orlando v. CFS Bancorp, Inc.*, No. 2:13-

cv-261, 2013 WL 5797624, at *4 (N.D. Ind. Oct. 28, 2013) ("[N]owhere does plaintiff specify which statements in the proxy statement are made misleading . . . . Rather, the plaintiff relies on various *truthful* statements . . . and argues that defendants must tell him more . . . ."). Though the Directors correctly point out that "there is no duty to disclose internal valuations under the federal securities laws[,]" *Kademian v. Ladish Co.*, 792 F.2d 614, 625 (7th Cir. 1986), and no duty to disclose all material information in general, *Stransky*, 51 F.3d at 1331, once the Directors chose to speak on the matter, they assumed an obligation to "speak the whole truth." *Id.*

But Trahan's complaint contains no support for his bald assertion that "truncated disclosure implies that Interactive's business was expected to level off after 2018[.]" Am. Compl. ¶ 78. First, as a matter of ordinary common sense, this is an absurd contention. The end of a projection period is no more or less than that. *Per se* it implies nothing at all about what is believed to follow, since such a prediction is precisely what is disclaimed by ending the projection period. Second, industry practice or custom, by contrast, may have led the reasonable investor to draw the inference drawn by the *Amended Complaint*, but the complaint alleges no such practice or custom. Third, Trahan faults the "truncated disclosure" for concealing the Directors' "expect[ation of] explosive growth" for PureCloud, *id.*, but the Management Forecasts in fact reveal that very expectation. According to Trahan's own calculations, the Management Forecasts "forecast . . . a 239%

increase [in unlevered free cash flow] from 2016 to 2017 and a 178% increase from 201[7] to 201[8]." Br. Opp. 19 n.10.[13]

Trahan points to *Selbst v. McDonald's Corporation*, where defendant corporation was charged with a knowing omission "of facts which seriously undermined the accuracy" of its optimistic sales-growth and earnings projections. No. 04 C 2422, 2005 WL 2319936, at *9 (N.D. Ill. Sept. 21, 2005). That is precisely not this case. The Directors are not charged with knowledge of any fact that would undermine the accuracy of the Management Forecasts; rather, Trahan charges the Directors with knowledge that the Management Forecasts would have been rosier if extended farther out and if PureCloud's "explosive" success were assumed as an input in the projection model. That is not a misleading omission of a material fact, it is a failure to state a tautology, and not a basis for false-statement liability under federal securities law.

### 3. PSLRA Safe Harbor

In any event, under the PSLRA, false-statement liability cannot be predicated on the Management Forecasts. The Management Forecasts are clearly forward-looking statements within the meaning of the PSLRA. They are projections of revenues and other financial data, *see* 15 U.S.C. § 78u-5(i)(1)(A), the accuracy of which could not be determined until after the projection period (assuming the Merger had not closed and Interactive were still an independent entity). Accordingly, the Directors cannot be liable

---

[13] Incredibly, after making these calculations, Trahan then declares that "there is no way to extrapolate from [them]" what Interactive's prospects would have been after 2018. Br. Opp. 19 n.10. *But compare* Am. Compl. ¶ 78 ("truncated disclosure implies that Interactive's business was expected to level off after 2018"). A "moving target," indeed. Reply Br. Supp. 1.

for the Management Forecasts either if they were identified as forward-looking and accompanied by meaningful cautions, *id.* § 78u-5(c)(1)(A)(i), or if they were supplied without the Directors' actual knowledge of their false or misleading nature. *Id.* § 78u-5(c)(1)(B)(i), (ii)(II). While either would suffice, we find both conditions met.

### a.  Identified as Forward-Looking with Cautions

First, the Management Forecasts were clearly identified as forward-looking statements. A "Cautionary Statement Concerning Forward-Looking Statements" prefaced the Proxy Statement as a whole, Dkt. 40 Ex. 2, at 35, explaining that forward-looking statements "relate[] to future plans, events, or financial condition or performance" and "can generally be identified by the use of words such as . . . 'forecast' [and] . . . 'project' . . . ." *Id.* The Management Forecasts were referred to as "the Forecasts" in the Proxy Statement, *id.* at 59, and were characterized as "projections of . . . future financial performance . . . ." *Id.* at 58. Dispelling any room for doubt, the Proxy Statement was explicit: "The [Management] Forecasts are forward-looking statements." *Id.* at 59 (referring reader to "Cautionary Statement," *id.* at 35).

Second, the Management Forecasts were accompanied by meaningful cautionary statements. The "Cautionary Statement Concerning Forward-Looking Statements" explained that forward-looking statements "involve a number of risks and uncertainties that could cause actual results and events to vary materially" from those predicted by the forward-looking statement, including "[t]he risk of not fully realizing expected benefits and synergies" from the Merger, "[w]orldwide economic conditions and their impact on customer purchasing decisions[,]" "[r]apid technological changes and competitive

[industry] pressures . . . [,]" and "[t]he fact that [Interactive's] shareholders would forgo the opportunity to realize the potential long-term value of the successful execution of [Interactive's] current strategy as an independent public company[.]" *Id.* at 36.

Still, "'boilerplate' warnings won't do; cautions must be tailored to the risks that accompany the particular projections." *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 732 (7th Cir. 2004). Obligingly, the Proxy Statement prefaces the Management Forecasts by noting "[i]mportant factors that may affect actual results and cause the [Management] Forecasts not to be achieved . . . [,]" to wit: "the mix of actual premise [*i.e.*, CIC] and cloud [*i.e.*, CaaS and PureCloud] orders, volume and timing of cloud orders, margins on cloud orders, general economic conditions, accuracy of certain accounting assumptions, changes in actual or projected cash flows, competitive pressures, and changes in tax laws." *Id.* at 59. Notably, the Proxy Statement provides cautions relating directly to Trahan's case concerning the unpredictable nature of the success or failure of Interactive's cloud-based business and the shareholders' forfeiture of a stake in the future success (if any) of Interactive's long-term business strategy should the Merger be approved.

b.  Made Without Actual Knowledge of Falsity

Moreover, Trahan has not pleaded facts as would permit a plausible inference that the Management Forecasts were presented with actual knowledge of their false or misleading nature. *See* Part I.A.2 *supra*. Specifically, Trahan has not alleged that any longer range projections actually existed. *See* Am. Compl. ¶ 78 ("regardless of whether any longer-range projections existed"). If no additional projections existed, it is

implausible that the Directors were actually aware of the false or misleading nature of their omission. It is implausible to charge a person with knowingly concealing what they do not possess. The Proxy Statement itself notes that Interactive "[did] not, as a matter of course, develop . . . long-term projections or internal projections of its future financial performance revenues [*sic*], earnings, financial condition or other results due to . . . the uncertainty of the underlying assumptions and estimates." Dkt. 40 Ex. 2, at 58.

> **B.** *Omission of Separate Financial Projections for Each Business Line from Management Forecasts*

Trahan next faults the Management Forecasts for failing to "disclose[] [Interactive's] financial projections by product line. By not doing so, [the Directors] misled stockholders about the true nature of Interactive's prospects for growth." Am. Compl. ¶ 95. That is, Interactive's "three businesses feature[d] markedly different financial attributes and radically different growth profiles. Presentation of Interactive's business as a singular, monolithic entity conceals the markedly different prospects for each of [Interactive's] business lines." *Id.* ¶ 92. Again we find these allegations sufficient to satisfy the PSLRA's pleading standards, but insufficient to plausibly allege a misleading omission of material fact for which the Directors are not sheltered by the PSLRA safe harbor.

> 1. Materiality

While financial projections, as noted above, may be material to cash-out merger decisions in general, Trahan's complaint does not permit the plausible inference that per-business-line projections were substantially likely to have been viewed by a reasonable

Interactive shareholder as having significantly altered the total mix of information available with respect to the Merger.

First, Interactive's shareholders, of course, held stock in the entire enterprise, and were faced only with the decision whether to divest from the entire enterprise. There is no allegation that there was talk of selling off the legacy businesses only while keeping Interactive as a going concern focused on PureCloud. Second, unlike the case to which Trahan points, here, there is no allegation that the enterprise-level number was concealing losses in the legacy businesses under cover of PureCloud's greater success,[14] or, more to the point, that PureCloud's success was being dragged down in the enterprise-level number by losses in the legacy businesses. The *Amended Complaint* in fact alleges nothing at all about the actual performance of Interactive's CIC and CaaS businesses;[15] it alleges only that they were "lower margin products" and that PureCloud was "high-margin . . . ." Am. Compl. ¶ 94. Third, as explained above with respect to longer-range

---

[14] Trahan cites *In re Next Level Systems, Inc.*, No. 97 C 7362, 1999 WL 387446, at *5 (N.D. Ill. Mar. 31, 1999) (SEC Rule 10b-5 securities fraud action), for the proposition that per-business-line projections may be material and their omission misleading. True enough, as an abstract proposition, but Trahan develops no cogent argument as to why such projections are material here. And even if *Next Level* supplied a better factual analogy to this case than it does, the court's dearth of analysis there, *see id.* at * 9 ("At [the motion to dismiss] stage, the court will not render any decision as to whether a particular statement is rendered misleading by a particular omission."), would not persuade us to carry the analogy very far.

[15] Indeed, as part of its stated pre-Merger long-term strategy, Interactive had expressed the intention (which Trahan does not attack as false or misleading) to support and develop the legacy businesses, not abandon them as failing. *See* Am. Compl. ¶ 44 ("Interactive made clear that it was not winding up its legacy businesses (including on-premises [*i.e.,* CIC] and older cloud [*i.e.,* CaaS] offerings). Brown stated on an August 3, 2015[,] conference call that, although the focus would be on PureCloud[,] 'all the while we'll continue to enhance our CIC battleship for organizations preferring a premises-based private cloud alternative.'").

projections, *mutatis mutandis*, the only basis for Trahan's expectation of high margins and high profitability was the Directors' own public statements of optimism. That the Directors hoped PureCloud would succeed was already at the time of the Merger well within the total mix of information available to reasonable investors. The Directors did not omit any material fact when they failed to supply figures such as Trahan would deem commensurate with their puffing.

### 2. Subjective and Objective Falsity

Even assuming the materiality of the omitted information, Trahan's complaint does not permit the plausible inference that the Management Forecasts were either subjectively or objectively false. *See Vallabhaneni*, 2016 WL 51260, at *15. They therefore were not actionably "misleadingly incomplete." *Va. Bankshares*, 501 U.S. at 1095.

Trahan has pleaded no facts as would plausibly suggest the Directors did not actually believe the Management Forecasts reflected a reasonable picture of Interactive's prospects absent per-business-line projections. Again, Trahan's sole ground for suspicion is his feeling that the figures presented in the Management Forecasts were not commensurate with the Directors' hopeful, optimistic puffery about PureCloud.

Further, omission of per-business-line projections cannot have rendered the Management Forecasts misleading to a reasonable investor. "Whether a fact is material and whether a statement omitting the fact is misleading are closely intertwined. The more important a fact would be to investors, the more likely its omission will mislead them." *Vallabheni*, 2016 WL 51260, at *11 (citing *Sterling Heights*, 2013 WL 566805, at *17;

*Anderson v. Abbot Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001)). Here, the omission complained of fails to have been plausibly misleading for the same reason it fails to have been plausibly material: there is no allegation that the omission concealed any fact, disclosure of which would have changed the calculus for Interactive shareholders.

### 3. PSLRA Safe Harbor

As above, the Management Forecasts are clearly forward-looking statements within the meaning of the PSLRA. *See* 15 U.S.C. § 78u-5(i)(1)(A). They were identified as such and accompanied by meaningful cautions; the Directors therefore cannot be liable for them. *See id.* § 78u-5(c)(1)(A)(i). Moreover, insofar as there is no plausible allegation the Management Forecasts were not made in good faith, *see* Parts I.A.2, I.B.2 *supra*, and no allegation that per-business-line projections were actually developed, such that the Directors' consciousness of wrongdoing might be inferred from their concealment, *see* Dkt. 40 Ex. 2, at 58,[16] it does not appear that the Management Forecasts were presented with actual knowledge of their false or misleading nature. The Directors therefore cannot be liable for them on this ground as well.

### C. Derivation of DCF Terminal Value in Union Square Analysis

---

[16] In this connection, the Directors also call our attention to one of Interactive's public SEC filings, incorporated by reference into the Proxy Statement, wherein Interactive discloses that it "view[ed] [its] operations and managed [its] business as principally one segment which is interaction management software solutions and associated services." Dkt. 40 Ex. 3, at 11 (2015 annual report); *see Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074, 2003 WL 21058251, at *8 (S.D.N.Y. May 9, 2003) (on motion to dismiss § 14(a) action, considering public SEC filings incorporated by reference into proxy statement). Trahan has not disputed the accuracy or authenticity of the incorporated filings. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997) (on motion to dismiss, permitting judicial notice of undisputed public record).

Trahan next faults Union Square's DCF analysis. For the inputs of that analysis, Union Square estimated net cash flows using the Management Forecasts; selected a cost-of-capital discount "ranging from 9.0% to 11.0%"; and derived a terminal value upon "appl[ication of] illustrative perpetuity growth rates, selected [on the basis of] Union Square's professional judgment experience, ranging from 3.5% to 4.5% . . . ." Dkt. 40 Ex. 2, at 67–68.[17] It is with this last input that Trahan quibbles:

> Union Square utilized the perpetuity growth rate, as opposed to the terminal multiple method, in performing its DCF analysis, and this is objectively wrong. . . . [Applying perpetuity growth rates] assumes minimal growth beyond 2018. . . . [B]ut PureCloud's meteoric growth profile belies applying such a conservative rate. Union Square should have used the terminal multiple method, which is more suitable when companies such as Interactive have not yet reached a steady-state level of growth.

Am. Compl. ¶¶ 96–98. As above, we find these allegations sufficient to satisfy the PSLRA's pleading standards, but insufficient to plausibly allege a material and knowingly false or misleadingly incomplete statement of opinion for which the Directors are not sheltered by the PSLRA safe harbor.

### 1. Materiality

In *Virginia Bankshares*, petitioners, defendants below, argued that Section 14(a) liability should not result where the proxy statement disclosed the factual basis on which

---

[17] Then, "[t]o derive an implied share price reference per share of [Interactive] common stock, as compared to the merger consideration of $60.50 per share . . . , Union Square divided the total implied equity value [generated by the DCF model] by the number of fully diluted shares of [Interactive] common stock outstanding. This analysis indicated an implied price per share of $38.52 to $62.68[.]" Dkt. 40 Ex. 2, at 68.

an allegedly false or misleading statement rested. 501 U.S. at 1097. The Court found that "[t]he answer to this argument rests on the difference between a merely misleading statement and one that is materially so. . . . [P]ublishing accurate facts in a proxy statement can render a misleading proposition too unimportant to ground liability." *Id.*

As noted above, valuation of a company may be material in the cash-out merger context. But, following the reasoning of *Virginia Bankshares*, courts have held immaterial individual inputs into financial projection models where the model and its assumptions are accurately stated. *Compare Ridler v. Hutchinson Tech. Inc.*, 216 F. Supp. 3d 982, 988 (D. Minn. 2016) ("Plaintiffs argue that the proxy should have disclosed the omitted multiples because it would have informed the investor of the flaws in the fairness opinion, specifically, that [financial advisor] did not apply a higher multiple to [defendant corporation's] financials. . . . [T]his is not a flaw—it is only a disagreement over the subjective methodology in valuing a company."), *and Malon v. Franklin Fin. Corp.*, No. 3:14-cv-671, 2014 WL 6791611, *7 (E.D. Va. Dec. 2, 2014) ("[Plaintiff complains] that the Proxy . . . fail[ed] to disclose certain unduly pessimistic assumptions used by the financial advisor. . . . Aside from the speculative nature of Plaintiff's [objections], any possible misconception on a stockholder's part would be allayed by referring to the financial advisor's report itself—which is appended to the Proxy." (original alterations, quotations, record citations omitted)), *with In re Hot Topic, Inc. Secs. Litig.*, No. CV 13-2939, 2014 WL 7499375, at *10 (C.D. Cal. May 2, 2014) ("Insofar as the omitted details prevented shareholders from realizing the relative inaccuracy of the projections, they may have affirmatively created an impression of a state of affairs that differs in a material way

from the one that actually existed." (original alterations, quotations, citations omitted)),

*and Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 871, 873 (S.D. Ohio 2013)

(distinguishing cases where "[c]ourts have dismissed shareholder claims seeking

assumptions and components of a financial advisor's cash flow analysis" from case at bar

where "analysis was flawed *and* shareholders needed the information to observe the

flaws" (emphasis added)). *Accord In re Plains Expl. & Prod. Co. Stockholder Litig.*, No.

8090-VCN, 2013 WL 1909124, at *9 (Del. Ch. May 9, 2013) ("Having been provided the

rates used, stockholders can judge for themselves whether the discount rate was

appropriate. . . . [Q]uibbles with a financial advisor's work cannot be the basis of a

disclosure claim. There are limitless opportunities for disagreement on the appropriate

valuation methodologies to employ, as well as the appropriate inputs to deploy within

those methodologies." (quotations and footnote citations omitted)); *Dias v. Purches*, No.

7199-VCG, 2012 WL 4503174, at *9 (Del. Ch. Oct. 1, 2012) ("[T]he criteria used to

select the ranges, multiples, or transactions that the financial advisors use in their

analyses are not material. . . . [W]hen a plaintiffs' only beef is that an investment banker

made mistakes in subjective judgment even though those judgments were disclosed to the

. . . stockholders, then the plaintiff has not identified a material omission or

misstatement." (alterations, quotations, and footnote citations omitted)).

    Here, the allegedly offensive model input, perpetuity growth rates "ranging from

3.5% to 4.5% . . . [,]" Dkt. 40 Ex. 2, at 68, was clearly stated in the Proxy Statement,

together with the other inputs and assumptions of Union Square's DCF analysis. Trahan

does not attack Union Square's weighted-average-cost-of-capital calculation, and his

attack on the Management Forecasts fails for the reasons stated above. Accordingly, with the DCF-analysis inputs clearly and accurately stated, Trahan was free to judge for himself whether application of perpetuity growth rates was appropriate. Trahan has not shown that a different method for deriving the terminal value was substantially likely to have influenced the vote of a reasonable investor.

### 2. Subjective and Objective Falsity

Even assuming the materiality of a single input of Union Square's DCF analysis, the *Amended Complaint* permits no plausible inference that Union Square's selection of perpetuity growth rates was not in good faith and with a reasonable basis.

Union Square asserted that its selection of "illustrative perpetuity growth rates" was based "upon the application of [its] professional judgment and experience[.]" Dkt. 40 Ex. 2, at 67. Trahan has pleaded no facts as plausibly controvert that assertion and permit an inference of bad faith on the part of Union Square in selecting the perpetuity growth rates or on the part of the Directors in including Union Square's analysis into the Proxy Statement. Again, Trahan's only support for his conclusion of bad faith is his sense that Union Square failed to infer and project the same level of success for PureCloud as he has inferred from the Directors' public puffing.

Further, no factual allegations support Trahan's conclusion that Union Square's selection of perpetuity growth rates was "objectively wrong[.]" Am. Compl. ¶ 96. Trahan does allege that Union Square "should have" used exit multiples because they are "more suitable" for companies without "a steady-state level of growth[,]" *id.* ¶ 98 (by which Trahan presumably means "a steady rate of growth"). Again, the only basis for the

implied and speculative minor premise Trahan smuggles into the syllogism here (that, by 2018, Interactive's rate of growth would not have steadied) is his inference from the Directors' hopes for PureCloud's "explosive," and, Trahan must imagine, *exponential*, growth.

In any event, Trahan's allegations, so far from permitting a plausible inference that selection of perpetuity growth rates was made without a reasonable basis, are in fact entirely consistent with Union Square's own statements in the Proxy Statement to the effect that the derivation of terminal values is a matter of "professional judgment and experience" with room for reasonable disagreement. Dkt. 40 Ex. 2, at 67. "The point is that both exit multiples and stable growth approaches are commonly employed to arrive at a terminal value for the DCF method, and both can be misused." *In re Bachrach Clothing, Inc.*, 480 B.R. 820, 872–73 (Bankr. N.D. Ill. 2012) (discussing valuation literature, noting conditions under which either method susceptible of abuse). If Trahan had performed his own DCF analysis, it appears that he would have preferred the use of exit multiples to derive the terminal value. But that is very far from a plausible allegation that the contrary approach was objectively unreasonable.

### 3.  PSLRA Safe Harbor

In any event, under the PSLRA, false-statement liability cannot be predicated on the Union Square Analysis. The Union Square Analysis is clearly a forward-looking statement within the meaning the PSLRA. In respect of the DCF analysis, the Union Square Analysis is a projection of value or future economic performance, *see* 15 U.S.C. § 78u-5(i)(1)(A), (C), the accuracy of which could not be determined until after the

projection period (assuming the Merger had not closed and Interactive were still an independent entity). The individual inputs of the DCF analysis are "assumptions underlying or relating to" the DCF analysis, and are themselves therefore forward-looking within the meaning of the PSLRA. *Id.* § 78u-5(i)(1)(D) Moreover, the Union Square Analysis is a report assessing the forward-looking statements embodied in the Management Forecasts, and is to that extent forward-looking as well. *See id.* § 78u-5(i)(1)(D). The Union Square Analysis is therefore sheltered if identified as forward-looking and accompanied by cautions, or if communicated without actual knowledge of its false or misleading nature.

a. Identified as Forward-Looking with Cautions

The Union Square Analysis was clearly, though less succinctly than were the Management Forecasts, identified as a forward-looking statement. The "Cautionary Statement Concerning Forward-Looking Statements" explained that forward-looking statements "relate[] to future . . . financial condition or performance" and "can generally be identified by the use of words such as . . . 'estimate,' . . . 'forecast,' . . . 'opinion,' [and] 'project' . . . ." Dkt. 40 Ex. 2, at 35. The Union Square Analysis was prefaced by a declaration that, "[i]n performing [its] financial analysis and arriving at its *opinion*," Union Square relied on the Management Forecasts, or "certain financial *projections* provided by [Interactive's] management . . . [,]" *id.* at 63 (emphasis added), specifically in conducting its DCF analysis. *Id.* at 67. The Union Square Analysis noted further that,

> [w]ith respect to the financial *forecasts* . . . provided to Union
> Square by [Interactive] management, for the purposes of
> Union Square's *opinion*, Union Square assumed that such

> financial *forecasts* were reasonably prepared on a basis
> reflecting the best currently available *estimates* and good faith
> judgments . . . as to the *future* competitive, operating and
> regulatory environments and related financial performance of
> Interactive.

*Id.* at 62 (emphasis added). In context, we find the above sufficient to identify the Union

Square Analysis, specifically in respect of the DCF analysis, as forward-looking.

Further, the Union Square Analysis was accompanied by meaningful cautionary

statements. As already noted, the "Cautionary Statement Concerning Forward-Looking

Statements" explained that forward-looking statements "involve a number of risks and

uncertainties that could cause actual results and events to vary materially" from those

predicted by the forward-looking statement, including "[t]he risk of not fully realizing

expected benefits and synergies" from the Merger, "[w]orldwide economic conditions

and their impact on customer purchasing decisions[,]" "[r]apid technological changes and

competitive [industry] pressures . . . [,]" and "[t]he fact that [Interactive's] shareholders

would forgo the opportunity to realize the potential long-term value of the successful

execution of [Interactive's] current strategy as an independent public company[.]" *Id.* at

36. Moreover, the Union Square Analysis explained that, in performing its DCF analysis,

it "made numerous assumptions with respect to industry performance, general business

and economic conditions and other matters. . . . Any estimates . . . are not necessarily

indicative of future results . . . , which may be significantly more or less favorable than

those suggested by such estimates." *Id.* at 68.

b.  Made Without Actual Knowledge of Falsity

Just as Trahan failed to allege facts suggesting Union Square's DCF analysis was performed in bad faith, Trahan has failed to allege facts suggesting that it was presented with actual knowledge of its false or misleading nature. As Union Square explained, the derivation of terminal values is a matter of "professional judgment and experience" with room for reasonable disagreement, Dkt. 40 Ex. 2, at 67; *see Bachrach Clothing, Inc.*, 480 B.R. at 872–73, and Trahan has alleged no plausible factual support for the conclusion that Union Square or the Directors knew that perpetuity growth rates would present a false or misleading picture of Interactive's prospects. Again, Trahan relies entirely on his supposition that the Directors' publicly expressed hopes for PureCloud demanded more optimistic figures and, Trahan must presume, whatever inputs are necessary to generate those figures.

### D. Directors' Opinions Recommending the Merger

In the Proxy Statement, the Directors communicated their opinion that the Merger was "fair to, advisable and in the best interests of [Interactive] and its shareholders . . . [,]" Dkt. 40 Ex. 2, at 43, because, among other considerations, the Directors professed a favorable view of "[t]he value represented by the [M]erger relative to other alternatives [Interactive] might pursue, taking into account . . . the risks and uncertainties associated with continuing to operate as an independent public company, including . . . the execution of [Interactive's] strategic plan . . . and [Interactive's] likely ability and timeframe to achieve valuations superior to [the Merger.]" *Id.* at 55. Trahan attacks these statements as materially false or misleading with sufficient particularity to satisfy the PSLRA's pleading standards.

But because Trahan has pleaded no facts permitting a plausible inference that this opinion and its supporting reason were not given in good faith and with a reasonable basis, this theory must fail. Trahan advances no grounds for the subjective and objective falsity of these statements other than the three respects above considered and rejected on multiple grounds, including, in each case, lack of materiality and lack of subjective and objective falsity. At the risk of repetition *ad nauseam*, Trahan is persuaded that the Directors *knew* that Interactive would be more valuable as a going concern than the value embodied in the Merger because the Directors expressed public *hopes* that PureCloud would be successful. And, because the Proxy Statement failed to express the same optimism, in Trahan's view, the Directors must have concealed that knowledge from the shareholders. Trahan's speculation on these points is unfounded by any plausible factual allegation in the *Amended Complaint*.

Trahan's *Omnicare* claim too necessarily fails. First, *a priori* no reasonable investor would view as material an inquiry into facts he did not consider material. Because Trahan has failed to show that the omissions from the Management Forecasts he complains of were material, he has necessarily failed to show that the omission of those omissions (that is, the Proxy Statement's failure to disclose those omissions) was material. Second, and more to the point, the Proxy Statement did not fail to disclose the Directors' investigation into the value represented by the Merger, but in fact discloses it—as Trahan's own pleading bears out in relying entirely on the Proxy Statement. Put differently, all of Trahan's supposed investigative defects were patent on the face of the

Proxy Statement. It cannot, therefore, be said that facts as to how the Directors formed their opinions were contrary to what a reasonable investor would expect, but not stated.

### E. Loss Causation

Finally, Trahan has failed to plead a plausible claim of loss causation. In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), a pre-*Twombly*/*Iqbal* decision in an SEC Rule 10b-5 securities fraud case,[18] the Supreme Court held that a plaintiff subject to the PSLRA does not carry her pleading burden as to loss causation "simply by alleging in the complaint . . . that the price of the security on the date of purchase was inflated because of [an actionable] misrepresentation." *Id.* at 338 (quotations, citation omitted). Such an allegation fails to allege "that the defendant's misrepresentation . . . proximately caused the plaintiff's economic loss." *Id.* at 346. To be sure, "[i]f the purchaser sells [the overvalued security] later after the truth [originally misrepresented by the defendant] makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so." *Id.* at 342. For example, the later lower price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events[.]" *Id.* at 343. "Given the tangle of factors affecting price, the most logic alone permits us to say" is that misrepresentation may be a necessary condition of loss, but, in the ordinary case, "it is insufficient." *Id.* The Court noted that "[t]he same is true

---

[18] Though *Dura Pharmaceuticals* was a SEC Rule 10b-5 case, the Court's discussion there of the loss-causation requirement imposed by the PSLRA "is cast at a much more general level and would apply, at minimum, to other securities cases involving economic loss[,]" such as this one. *Lane v. Page*, 649 F. Supp. 2d 1256, 1278 (D.N.M. 2009) (analyzing § 14(a) claim).

in respect to a claim that a share's higher price is lower than it would otherwise have been[.]" *Id.*

*Dura Pharmaceuticals* teaches that Trahan's complaint fails to allege loss causation simply by pleading that the share price of $60.50 per share of Interactive stock on the date of sale was depressed because of an actionable misrepresentation, that is, by pleading that Interactive shareholders were induced to approve the Merger at that price by an actionable misrepresentation, causing damages in the amount of "the difference between the price Interactive shareholders received and Interactive's true value at the time of [the Merger] . . . ." Am. Compl. ¶ 115. Trahan speculates that, absent the misleadingly pessimistic Proxy Statement, the shareholders would not have approved the Merger in hope that Interactive would prove more valuable as a going concern than the Merger consideration implied. But approval of the Merger can only have proximately caused economic loss if the shareholders' hope would have been *realized*, and Trahan has not plausibly alleged that it would have been. Absent an allegation of a definite, immediately available, superior alternative to the Merger consideration (a higher competing offer, for example), Trahan's allegation depends on the marketplace eventually valuing Interactive at higher than $60.50 per share[19] at some indeterminate future date when Trahan still held his shares and was willing to sell them. "Given the tangle of factors affecting price," and given that, "[o]ther things being equal, the longer the time . . . , . . . the more likely that [factors other than an actionable misrepresentation]

---

[19] As noted above, the day before the Merger was announced, Interactive was trading at $44.49 per share.

caused the loss[,]" *Dura Pharms.*, 544 U.S. at 343, Trahan has alleged no more than a speculative possibility that he was economically injured by any misrepresentation in connection with the Merger. And that is not enough.

For all the above reasons, the *Amended Complaint* fails to state a Section 19(a) claim. Accordingly, the motions to dismiss are GRANTED as to the Section 19(a) claim.

## II. Section 20(a)

Section 20(a) imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision" of the Exchange Act, jointly and severally with the person controlled, subject to a good-faith defense. 15 U.S.C. § 78t(a). Section 20(a) liability is derivative and necessarily fails if the underlying claim fails. *Dixon v. Ladish Co., Inc.*, 785 F. Supp. 2d 746, 748 n.2 (E.D. Wis. 2011) (citing *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)).

Because we have determined that Trahan's complaint fails to state a claim under Section 19(a), it necessarily fails to state a claim under Section 20(a). Accordingly, the motions to dismiss are GRANTED as to the Section 20(a) claim.

## III. Dismissal with Prejudice and Mandatory Sanctions Briefing

When deciding whether to dismiss a securities case subject to the PSLRA with prejudice, "each case must be evaluated on its own merit, in light of its own procedural history." *Fannon v. Guidant Corp.*, 583 F.3d 995, 1002 (7th Cir. 2009). "[G]iven the demanding nature of PSLRA pleading standards[,]" *id.*, courts have sometimes found dismissal without prejudice to be the better course. *Id.* (citing cases). But where "it is clear . . . that the complaint could not be saved by amendment[,]" *id.* (quoting *Eminence*

*Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)), and where "plaintiff[] had, as a practical matter, a number of opportunities to craft a complaint that complied with the standards of the PSLRA[,]" dismissal with prejudice is within this Court's sound discretion. *Id.* (affirming dismissal with prejudice where nine individual earlier-filed complaints on same facts, later consolidated with one-year period to investigate consolidated claim).

First, as adverted to repeatedly throughout this *Order*, Trahan's basic theory of his case is not legally colorable or factually plausible. The failure of Trahan's complaint to state a claim is not owed to the heightened pleading standards of the PSLRA; rather, the complaint runs aground on immateriality, lack of falsity, and the Directors' safe-harbor immunity as a matter of law.

Second, while the instant complaint is only Trahan's first amendment, the Directors point to *Fischer v. Interactive Intelligence Group, Inc.*, No. 1:16-cv-2666 (S.D. Ind. Oct. 6, 2016) (Pratt, J.),[20] a Section 14(a) lawsuit brought by a different Interactive shareholder two days after the Proxy Statement was filed, attacking the Management Forecasts and the Union Square Analysis as false and misleading by omission on grounds, among others, substantially similar to those on which Trahan has bottomed his complaint. *See id.*, Dkt. 1 (complaint). Plaintiff Fischer stipulated to dismissal of his lawsuit with prejudice on November 1, 2016, *see id.*, Dkt. 21, three days after receiving

---

[20] A complaint in a different lawsuit is a proper subject for judicial notice on a motion to dismiss. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011).

Interactive's brief in opposition to his motion for a preliminary injunction. *Id.*, Dkt. 19.

Thus enjoying the benefit of a full airing of potential problems with the Proxy Statement

before drafting either of his two complaints in this matter, Trahan has had ample

opportunity to craft a plausible allegation of a securities-law violation, but has not done

so. In his brief, Trahan points to no claim or theory that could be saved with additional

opportunities to plead it. Accordingly, dismissal shall be with prejudice.

Under the PSLRA, "upon final adjudication of the action, the court shall include in

the record specific findings regarding compliance . . . with each requirement of Rule

11(b)[, Fed. R. Civ. P.,] . . . as to any complaint, responsive pleading, or dispositive

motion." 15 U.S.C. § 78u-4(c)(1). Before making any finding of a Rule 11(b) violation,

the court "shall give" the violator "notice and an opportunity to respond." *Id.* § (2). The

parties are therefore invited to submit briefing on any Rule 11(b) issues as may have

arisen during the prosecution of this case. Final judgment shall be entered in favor of the

Directors, Interactive, and Genesys once such briefing, if any, has been received and

considered. The parties shall have 21 days from the date of this *Order* to submit such

briefing.

<u>**Conclusion**</u>

For the above reasons, the *Amended Complaint* is DISMISSED WITH

PREJUDICE. Final judgment shall be entered by separate document, Fed. R. Civ. P.

58(a), following receipt and consideration of any Rule 11 briefing.

IT IS SO ORDERED.

Date: 3/28/2018

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kathleen A. Musgrave Farinas
GEORGE & FARINAS, LLP
kf@lgkflaw.com

David K. Herzog
FAEGRE BAKER DANIELS LLP (Indianapolis)
david.herzog@faegrebd.com

Daniel R. Kelley
FAEGRE BAKER DANIELS LLP (Indianapolis)
daniel.kelley@faegrebd.com

Eun Jin Lee
ROBBINS GELLER RUDMAN & DOWD LLP
elee@rgrdlaw.com

John R. Maley
BARNES & THORNBURG LLP (Indianapolis)
jmaley@btlaw.com

Justin R. Olson
FAEGRE BAKER DANIELS LLP (Indianapolis)
justin.olson@FaegreBD.com

David T. Wissbroecker
ROBBINS GELLER RUDMAN & DOWD LLP
dwissbroecker@rgrdlaw.com

Paul A. Wolfla
FAEGRE BAKER DANIELS LLP (Indianapolis)
paul.wolfla@faegrebd.com